**BUTTES RESOURCES COMPANY,**
Appellant/Appellee,

v.

**RAILROAD COMMISSION OF TEXAS & J.L. Schneider, Jr.,**
Appellees/Appellants.

No. A14–85–928–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

April 30, 1987.

Rehearing Denied July 2, 1987.

---

Glenn E. Johnson, Leland B. Kee, Austin, for appellant/appellee.

Frank Douglas, Jose Manuel Rangel, John W. Camp, Austin, for appellees/appellants.

Before J. CURTISS BROWN, C.J., and MURPHY and ROBERTSON, JJ.

## OPINION

J. CURTISS BROWN, Chief Justice.

This is a Mineral Interest Pooling Act (MIPA) case. At J.L. Schneider's request, the Railroad Commission of Texas issued an order pooling 22 acres leased by Schneider with parts of a unit operated by Buttes Resources Company (Buttes). Buttes appealed to the district court in Brazoria County, where the gas well was located. The district court upheld the pooling order except that it changed the effective date of the order so that it would not be retroactive. Buttes appeals to this court, again contesting the pooling order. Schneider and the Railroad Commission appeal the trial court's action in changing the order's effective date. We affirm the trial court's judgment.

A brief factual background is necessary to the understanding of the issues presented. Buttes completed a discovery gas well called Drisdale No. 1 in January 1976. Buttes completed Reese No. 1, a second successful gas well to the southwest of Drisdale No. 1 in November 1976. Tempo-rary gas field rules were adopted by the Railroad Commission effective November 28, 1977. The temporary rules became permanent without protest in September 1979.

In determining the field rules the Railroad Commission adopted Buttes's reservoir estimates and map, which indicated that both wells drained a common reservoir. To the north and east of the Drisdale No. 1 Unit's 179 acres lay another 55 productive acres in the reservoir. Buttes held leases on those 55 acres, but let them expire beginning in 1979. Schneider began buying leases on tracts within that 55 acres in 1979. After securing those leases he approached Buttes in an attempt to pool his 55 acres with the Drisdale No. 1 Unit. Drisdale No. 1 Unit is a voluntarily pooled unit operated by Buttes. After several telephone inquiries, Schneider met with a vice president of Buttes in Dallas on June 9, 1981. He was told that Buttes had no interest in pooling. Schneider, through his attorneys, made a formal written offer to Buttes Resources by a letter dated July 22, 1981. That offer was refused by Buttes in a July 29, 1981, letter. Without making his offer to any other interest owners, Schneider, on December 29, 1981, applied to the Railroad Commission for an order to force pooling his 55 acres with the Drisdale No. 1 Unit.

The subject gas field is a water-drive reservoir. Schneider's acreage is "downstructure"; that is, the reservoir is encountered at a deeper depth on his acreage than it is on some of the Drisdale Unit's acreage. As the Drisdale No. 1 well produces, gas is drained off Schneider's acreage onto the Drisdale Unit's acreage and is displaced by water.

At the time of the MIPA hearing on Schneider's request, Schneider acknowledged that 33 acres of the originally productive 55 acres had been "watered out." He requested that all 55 acres be included in the unit, but in the alternative, suggested that the 22 acres not yet invaded be pooled. The commission pooled only 22 acres, but left Buttes the option to voluntarily include all 55 acres in the unit so that Buttes could maintain a proration formula

based on originally productive acreage, as is the usual practice in water-drive reservoirs.

In its first point of error Buttes asserts that the Railroad Commission had no jurisdiction to order compulsory pooling under the Mineral Interest Pooling Act because Schneider did not make a fair and reasonable offer to the owners of the interests in the proposed unit as required in section 102.013 of the act. Tex.Nat.Res.Code Ann. § 102.013(a), (b) (Vernon 1978).

Schneider's July 22 letter outlined an offer "made to Buttes Resources Company as operator of the unit and agent for all other interest owners in this unit." The offer proposed that Schneider's 55 acres be pooled with the 179 acres in the Drisdale Unit with production allocated on the basis of each owner's pro rata share of the productive acreage within the new pooled unit. The offer proposed that each new participant share in the costs of drilling and completing the well on the basis of his pro rata share of the acreage contributed to the new unit. Each owner could elect to pay these costs by either tendering cash within 30 days of notification that the unit had become effective or by having Buttes deduct from production the payment, plus a 100 percent risk penalty.

Buttes suggests four reasons the offer was not adequate: (1) it did not provide for adequate payment of expenses and risks incurred in drilling; (2) it included nonproductive acreage; (3) it was not made to all interest owners prior to filing the compulsory pooling application; and (4) it included land not under Schneider's control at the time it was made.

■ A fair and reasonable offer to pool voluntarily is a jurisdictional prerequisite to a compulsory pooling order. *Carson v. Railroad Commission*, 669 S.W.2d 315, 316 (Tex.1984); Tex.Nat.Res.Code Ann. § 102.013(b) (Vernon 1978). The supreme court has declined to define a fair and reasonable offer, but the court has instructed that "the offer must be one which takes into consideration those relevant facts, existing at the time of the offer, which would be considered important by a reasonable person in entering into a voluntary agreement concerning oil and gas properties." *Carson*, 669 S.W.2d at 318.

■ First Buttes suggests that Schneider's offer was not fair and reasonable because it failed to include a cash payment to Buttes as a risk factor (or risk penalty) for drilling of the wildcat well. That is, the offer did not require that Buttes be compensated prior to the payment of proceeds from the well to Schneider.

A risk factor or penalty may be a necessary element in some offers to pool. For example, an owner who had the opportunity to participate before drilling began may need to include a risk factor or penalty in order to make a fair and reasonable offer after he has chosen to "ride down the well." In this case Schneider did not wait to see if the well would be a producer before seeking to join the unit. He could not have acquired leases to the 55 acres earlier because they were held by Buttes.

We also note that Schneider's offer was structured in the same manner that the legislature has directed the Railroad Commission when ordering pooling. *See* Tex. Nat.Res.Code Ann. § 102.052(a) (Vernon 1978). We hold that the offer was not unreasonable simply because it failed to include a cash payment of a risk penalty.

■ Second, Buttes asserts that the offer was not reasonable because it proposed to pool acreage that was no longer productive. Buttes emphasizes that the Railroad Commission is empowered to pool only acreage that is productive at the time of the compulsory pooling order. Tex.Nat. Res.Code Ann. § 102.018 (Vernon 1978). From that Buttes seems to reason that it was unreasonable for Schneider to offer to pool more acreage than can be force-pooled by the Commission. We hold that the offer to include all 55 acres in the unit was not unreasonable in light of the Railroad Commission's policy regarding production allocations in water-drive reservoirs and other factors. In water-drive reservoirs the Commission usually counts all the originally productive acreage in applying the proration formula for production allocation.

The "allowable" need not change as the producing acreage shrinks. In recognition of this policy, the Commission's final order in this proceeding expressly provided that "for proration purposes, formerly productive acres may be assigned to the unit, provided that Buttes Resources Company either has that acreage pooled at present or chooses to voluntarily include that acreage." From Buttes's standpoint, the advantages of retaining a larger allowable would at least partially offset the disadvantages of including all 55 acres in the unit proposed by Schneider.

■ We also have considered other factors. The Railroad Commission, on three occasions, has determined that the originally productive acreage in the reservoir included the 55 acres. The last occasion was in the latter part of 1980 when the Commission force-pooled into the Buttes Reese Gas Unit the 50 acres south and west of that unit. Buttes made no attempt to include the 55 acres north and east of the Drisdale Unit No. 1 even though the Commission had determined the acreage to be productive and Buttes held the leases on that land. We realize that a compulsory pooling action is not the forum in which to decide whether Buttes wrongly drained acreage under lease without compensating its lessors. However, these facts did add leverage to Schneider's position as a representative of the lessors of the 55 acres and can be considered now in determining whether the offer was reasonable.

■ Next Buttes complains that the offer does not meet the requirements of section 102.013 of the MIPA because it was not made to all interest owners before Schneider made his application to the Commission.

Schneider's offer was made to Buttes "as operator of the unit and agent for all other interest owners in this unit." Buttes denies that it had any authority to pool the other interest owners, but when it answered Schneider's offer in writing it did not alert Schneider to that problem nor did it cite it as a reason not to accept the offer. Buttes's response was: "It is our very firm position that the acreage in question is not productive and would be of no benefit to the Drisdale Gas Unit. As such, we must refuse your offer for voluntary pooling."

All interest owners were mailed the offer February 2, 1982. All owners were notified of the hearing at least 30 days in advance, as required in section 102.016 of the act. Tex.Nat.Res.Code Ann. § 102.016 (Vernon 1978).

Section 102.013 reads in part:

(a) The applicant shall set forth in detail the nature of voluntary pooling offers made to the owners of the other interests in the proposed unit.

(b) The commission shall dismiss the application if it finds that a fair and reasonable offer to pool voluntarily has not been made by the applicant.

Tex.Nat.Res.Code Ann. § 102.013(a), (b) (Vernon 1978). Nowhere in the act do we find a specific requirement that the applicant make the offer to *all* interest holders individually before making his application. Neither does it seem to have been the intent of the legislature that such a requirement be implied.

To require the offer to be made to all interest owners before applying to the Commission would be, in many instances, an unfair and unnecessary burden to place upon the applicant. A typical applicant may not have access to current names and addresses of all interest owners. An illustration is found in this very case. Schneider used a mailing list obtained from division orders (of public record) to send notices of the first scheduled hearing, but many notices were returned to sender. That hearing was postponed and new notices sent using a mailing list provided by Buttes.

Also, under the facts of this case, when Buttes rejected Schneider's offer without any offer or attempt to negotiate, voluntary pooling was no longer a realistic possibility regardless of the desire or acceptance of any other interest owners. Schneider's failure to make the offer to all interest owners before filing the application did not prevent the Railroad Commission from acquiring jurisdiction over the case.

Buttes's final argument under point of error one is that the offer does not meet the requirements of the act because Schneider did not own rights to all the acreage included in the offer. Schneider acquired one lease, the Batman lease, after making its offer to Buttes, in an "abundance of caution." He already had more than 55 acres leased, but thought there was some possibility the Batman land was part of the 55 acres he sought to pool. There is nothing else in the record to indicate that Schneider did not control all 55 acres at the time he extended his offer. Point of error one is overruled.

In its second point of error Buttes argues that the Railroad Commission's order cannot be affirmed because it pooled acreage that was not within the productive limits of the reservoir at the time of the Commission's order. Buttes cites to section 102.018 of the MIPA, which provides:

The commission shall pool only the acreage which at the time of its order reasonably appears to lie within the productive limits of the reservoir.

Tex.Nat.Res.Code Ann. § 102.018 (Vernon 1978).

Buttes urges that this provision requires the Commission to determine the current productive acreage as of the *date* of its order. Such a construction is unreasonable given the nature of Railroad Commission proceedings, the complexities of the issues, and the technical nature of the evidence involved. After the hearing, the Commission and its examiners must have some time to discharge their duties under the Administrative Procedure and Texas Register Act (APTRA). The examiners must evaluate the evidence and arguments, issue a proposal for decision, and allow for exceptions and replies to that proposal. Then the Railroad Commission must consider the evidence and arguments before issuing a final order. *See* Tex.Rev.Civ.Stat.Ann. art. 6252–13a, § 15 (Vernon Supp.1987). Evidence cannot be continuously updated to be absolutely current at the date the Commission issues its order. "At the time of its order" must be interpreted as a generic reference to the entire Commission pro-

ceeding. (A related issue concerning the effective date of the order is discussed below in answer to the cross-points.)

The second argument urged by Buttes under point of error two is that the Commission's finding that 22 of Schneider's acres were productive was wrong in light of the geological data presented at the hearing. The trial court was correct in upholding the Commission's order because it was supported by substantial evidence. This is the review standard provided for in the MIPA and the APTRA. Tex.Nat.Res. Code Ann. § 102.111 (Vernon 1978); Tex. Rev.Civ.Stat.Ann. art. 6252–13a, § 19(e) (5) (Vernon Supp.1987). Neither the trial court nor this court is permitted to substitute its judgment or conclusions to be drawn from the evidence. *Imperial American Resources Fund, Inc. v. Railroad Commission,* 557 S.W.2d 280, 286 (Tex. 1977). Point of error two is overruled.

In its third point of error Buttes complains that the trial court should have remanded the proceeding to the Railroad Commission to hear additional evidence on the productive limits of the reservoir. Under section 19(d)(2) of the APTRA a district court *may* remand a proceeding to an agency for consideration of new evidence if the court is satisfied that the additional evidence is material and that there were good reasons for the failure to present it to the agency. *San Diego Independent School District v. Central Education Agency,* 704 S.W.2d 912, 914–15 (Tex.App. —Austin 1986, writ ref'd n.r.e.); *Texas Oil & Gas Corp. v. Railroad Commission,* 575 S.W.2d 348 (Tex.Civ.App.—1978, no writ); Tex.Rev.Civ.Stat.Ann. art. 6252–13a, § 19(d)(2) (Vernon Supp.1987). We review the trial court's decision regarding remand using the abuse of discretion test. *Public Utility Commission v. Houston Lighting & Power Co.,* 715 S.W.2d 98, 105 (Tex.App. —Austin 1986, writ granted).

The trial court made no findings of fact and conclusions of law. It apparently decided that the additional evidence was either not material or had been available at the time of the hearing. There is sufficient evidence to support the trial court's deci-

sion. One of the well logs Buttes called new and material evidence existed in 1981, but Buttes had not requested a copy until after the hearing. Another well log, the TDT log on the Force No. 1 well, was run after the hearing. Buttes drilled that well in 1979. In preparation for the Schneider hearing Buttes ran TDT logs on the Drisdale No. 1 and Reese No. 1 wells. It based its theory on how the reservoir was structured largely on experts' interpretations of these logs. The trial court could have reasonably concluded that Buttes had failed to give a good reason for not running the TDT log on the Force No. 1 well and not acquiring the 1981 log before the hearing. The third piece of evidence offered by Buttes as new and material concerned water test data gathered from testing done in July and August of 1982 on the Drisdale No. 1 well. Schneider's expert testified at trial that this data was not material because the production of water in the well was a result of a phenomenon called "coning" and did not indicate that the Commission was wrong in estimating the productive acreage. The trial court did not abuse its discretion by refusing to remand so that the Commission could hear additional evidence. Point of error three is overruled.

In its fourth point of error Buttes argues that the district court erred in holding that the Railroad Commission's order adequately described the land in the pooled unit. Under the MIPA the Commission is required to "describe the land included in the unit" in each order effecting compulsory pooling. Tex.Nat.Res.Code Ann. § 102.-017(b)(1) (Vernon 1978). The order provides:

> Therefore, it is ordered by the Railroad Commission of Texas that, pursuant to the Mineral Interest Pooling Act, a pooled unit for the Buttes Resources Company Drisdale Gas Unit Well No. 1 be established consisting of 175 currently productive acres in the Alvin, North

(8850') Field, these 175 productive acres to be comprised of 153 currently productive acres assigned to the Buttes Resources Company Drisdale Gas Unit Well No. 1 and 22 currently productive acres belonging to J.L. Schneider, Jr. Such unit is to be called the Buttes Resources Company—J.L. Schneider, Jr., Drisdale Gas Unit Well No. 1, with Buttes Resources Company appointed as operator for the unit.

We can locate nothing in the findings of fact, the examiner's proposal for decision, or the record before the Railroad Commission that provides any more detail in locating the unit. Schneider did present as an exhibit at the hearing a survey of the entire 55 acres proposed to be pooled, but there is no equivalent for the 22 acres that he alternatively requested to be pooled. Schneider holds leases to seven tracts of land totalling 133.31 acres. The tracts vary in size from 1.36 acres to 51.75 acres. As operator of the unit, Buttes must be given precise information as to how many acres under each lease fall within the 22 acres pooled by the order. Schneider and the Railroad Commission suggest that whatever information Buttes needs can and will be supplied by Schneider and there is no need to remand this cause to the Railroad Commission simply so that the information can be included in the order. If there is some question as to the allocation to be suggested by Schneider, the Railroad Commission suggests that it can resolve the problem in a separate proceeding. We agree that this procedure is preferable to a formal remand of the case. It would be impractical to require the Commission to describe in its order the land to be pooled with a metes and bounds description. Until the final order was issued neither Schneider nor the examiners knew how many acres would be included in the new unit. Point of error four is overruled.[1]

---

1. In future proceedings we recommend that at the time the hearing examiners make their recommendations to the Commission and propose findings of fact and conclusions of law, the examiners request from the applicant a metes and bounds description of the acreage the exam-

iners have proposed to be pooled along with a listing of all interest owners represented by the applicant, the acreage each owner controls, and whatever other information an operator may need to execute the proposed order. The metes and bounds description and listing could then

In its last point of error Buttes claims the Commission's findings of fact and conclusions of law are inadequate because they do not comply with section 16(b) of the APTRA. Specifically, Buttes complains that the order fails to address any underlying facts showing (1) that the offer to pool was fair and reasonable and (2) that Schneider had 22 currently productive acres of 55 originally productive acres, and Buttes had 153 currently productive acres of 179 originally productive acres.

The APTRA requires that "Findings of fact, if set forth in statutory language, must be accompanied by a concise and explicit statement of the underlying facts supporting the findings." Tex. Rev.Civ.Stat.Ann. art. 6252–13a, § 16(b) (Vernon Supp.1987). The Commission's conclusion that Schneider's offer was fair and reasonable is couched in statutory language. The question remains whether the statement is a finding of fact, as that term is used in the APTRA. Our supreme court has held that whether an offer to pool was fair and reasonable "is not a substantial evidence review ... it is a jurisdictional review." *Carson v. Railroad Commission*, 669 S.W.2d 315, 316 (Tex.1984). In *Carson*, the court considered the offer in question and held "as a matter of law" that it was not reasonable. *Id.* at 318. From this we conclude that the Commission's statement that Schneider's offer was fair and reasonable was a conclusion of law, not a statement of fact. (The Commission itself listed the statement under its conclusions of law.) An appellate court "may not impose an additional fact-finding requirement" beyond those required by section 16(b) of the APTRA even if judicial review would be enhanced by the added rule. *Texas Health Facilities Commission v. Charter Medical-Dallas, Inc.*, 665 S.W.2d 446, 451 (Tex.1984); *Public Utility Commission v. Texland Electric Co.*, 701 S.W.2d 261, 269 (Tex.App.—Austin 1985, writ ref'd n.r.e.). The APTRA does not require that

conclusions of law set forth in statutory language be accompanied by underlying findings of fact. The failure to support the conclusion that the offer was fair and reasonable cannot be a basis for remanding the action to the Railroad Commission.

The finding concerning productive acreage was an ultimate finding of fact but not one set forth in statutory language. It did not need to be further supplemented with underlying facts supporting the findings. *Imperial American Resources Fund, Inc. v. Railroad Commission*, 557 S.W.2d 280, 286 (Tex.1977). The findings as a whole were "sufficient to serve the overall purpose evident in the legislative requirement that they be made." *Charter Medical*, 665 S.W.2d at 452. Point of error five is overruled.

We now turn to the cross-points, brought by Schneider and the Railroad Commission. Both cross-appellants urge that the trial court erred in finding that the Railroad Commission was without legal authority to establish an effective date which was earlier than the date of the Commission's order. The trial court changed the effective date of the order from June 22, 1982, (60 days after the April 22–23, 1982, hearing) to May 23, 1983, (the day the Commission issued its order).

We agree with Buttes that the earlier effective date resulted in an unconstitutional retroactive interference with vested property rights. Tex. Const. Art. 1, § 16. The MIPA is clearly "in derogation of the right of one to do with his own property as he so desires." *Superior Oil Co. v. Railroad Commission*, 519 S.W.2d 479, 482 (Tex.Civ.App.—El Paso 1975, writ ref'd n.r. e.). The cases relied upon by Schneider and the Railroad Commission[2] to support the constitutionality of the earlier effective date are all utility rate cases. In Texas, utility rates are not classified as vested property rights. *Southwestern Bell Tele-*

be included by reference in the Commission's final order.

**2.** *Railroad Commission v. Lone Star Gas Co.*, 656 S.W.2d 421 (Tex.1983); *Railroad Commission v. City of Fort Worth*, 576 S.W.2d 899 (Tex.

Civ.App.—Austin 1979, writ ref'd n.r.e.); *United Gas Public Service Co. v. State*, 89 S.W.2d 1094 (Tex.Civ.App.—Austin 1935, writ ref'd), *aff'd* 303 U.S. 123, 58 S.Ct. 483, 82 L.Ed. 702 (1938).

*phone Co. v. Public Utility Commission,* 615 S.W.2d 947, 957 (Tex.Civ.App.—Austin), *writ ref'd n.r.e. per curiam,* 622 S.W.2d 82 (Tex.1981). A pooling order under the MIPA affects vested property rights of private, not public, parties and cannot be made retroactive. The cross points are overruled.

The judgment of the trial court is affirmed.