**AMERICAN OPERATING COMPANY, Appellant,**

v.

**RAILROAD COMMISSION OF TEXAS and Southwest Minerals, Inc., Appellees.**

No. A14–87–00208–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Oct. 15, 1987.

Rehearing Denied Dec. 3, 1987.

Michael E. McElroy, Paul B. Keeler, Austin, for appellant.

Jose Manuel Rangel, Lloyd Broussard, Austin, Robert A. Rowland, Jr., Houston, for appellees.

Before ROBERTSON, DRAUGHN and ELLIS, JJ.

## OPINION

ROBERTSON, Justice.

This is a Mineral Interest Pooling Act (MIPA) case. At the request of Southwest Minerals, Inc., (Southwest) the Railroad Commission of Texas (Commission) issued

an order pooling acreage leased by Southwest with parts of a unit operated by American Operating Company (American). American appealed to the district court of Galveston County where the gas well was located. The district court upheld the pooling order. American appeals to this court, again contesting the pooling order. Issues concern the jurisdiction of the Commission to consider the application for forced pooling, adequacy of notice of the Commission hearing, whether the order deprives the working interest owners of their fair share of production, retroactivity in the effective date of the order and the adequacy of the description of the property being pooled. We modify the judgment and affirm.

A brief factual background is necessary. Oil and gas leases in the League City Townsite area were voluntarily pooled together to form a 694–acre unit in January 1982. Southwest was not involved in this voluntary pooling agreement. The unit was designated the American Operating Company No. 1 Colonel William E. Lobit, et al., Gas Unit. The unit is made up primarily of blocks and lots in the League City Townsite area. On March 5, 1982, the "Lobit Gas Unit Well No. 1" was completed with the discovery of a small gas field. The field was designated the League City Townsite (Andrau, U.) Field.

Southwest had obtained leases in the same area. In July 1983, a temporary field rule hearing was held at the request of Southwest as a prerequisite to the pooling of the acreage on which it held leases with a portion of the acreage voluntarily pooled by American. Temporary field rules became effective in August 1983. By letters dated August 12, 1983, August 30, 1983, and September 23, 1983, Southwest made an offer to American to voluntarily pool 54.9 productive acres to which Southwest held leases with 267.6 productive acres from the 694–acre unit originally voluntarily pooled by American. This offer was rejected by American.

Southwest then made an application to force pool under the Mineral Interest Pooling Act (Tex.Nat.Res.Code Ann. §§ 102.001 et seq. (Vernon 1978)). The Commission issued notices and held hearings, and on June 1, 1984, the hearings examiner issued a "Proposal for Decision," recommending the formation of a pooled unit containing 277.5 productive acres. American filed exceptions, and the Commission reopened the hearing. As a result, the total acreage of the unit was changed from 277.5 currently productive acres to 258.1 currently productive acres because Southwest did not have authority to pool five of the tracts included in the initial proposal or because the interest owners of those tracts had not been notified of the hearing. The Commission issued its final order dated March 25, 1985, establishing

a pooled unit for the League City Townsite (Andrau, U.) Field for the American Operating Company Lobit Gas Unit Well No. 1 ... consisting of 258.1 currently productive acres in the League City Townsite (Andrau, U.) Field, these 258.1 productive acres shown on Appendix "C" and described in Appendix "D" ...

The order was made effective January 14, 1984.

In its first point of error American contends the trial court erred in affirming the Commission order because the Commission had no jurisdiction to consider the application for forced pooling. American argues the Commission was without jurisdiction because: (1) Southwest's voluntary pooling offer was not fair and reasonable, and (2) the pooling offer was not made to all the interest owners in the proposed unit.

Southwest's August 12 letter extended "to American Operating Company (American) and all other interest holders in the American operated Lobit Et Al No. 1 Gas Unit a Voluntary Offer to Pool the productive acreage in their respective tracts with the 57.2 productive acres in the Southwest tracts." Attached to the letter as an exhibit was a plat showing the boundaries of the proposed unit. The offer was made "to American as operator of the unit and agent for all other interest owners in this unit." The offer provided that "If American does not have the authority to speak for their working interest partners and all royalty owners, please send us immediately the

names and addresses of the other interest owners so that this same offer can be made to them." The offer proposed that production be allocated on the basis of each owner's pro rata share of the productive acreage within the new pooled unit. The offer further proposed that each new participant share in the cost of drilling and completing the well on the basis of his pro rata share of the acreage contributed to the new unit. Each owner could elect to pay these costs by either tendering cash within thirty days of being notified that the unit had become effective or by having American deduct from production the payment until Southwest's pro rata share had been recouped. Southwest did not propose a risk penalty to be paid to the working interest owners.

■ American contends this offer was not fair and reasonable for three reasons: (1) it included acreage which Southwest knew was not productive; (2) it expressly negated any compensation for the risk incurred in drilling the well; and (3) it was not a bona fide attempt to reach a voluntary pooling agreement. As we recently stated in *Buttes Resources Co. v. Railroad Comm'n*, 732 S.W.2d 675 (Tex.App.–Houston [14th Dist.] 1987, writ ref'd n.r.e.):

> A fair and reasonable offer to pool voluntarily is a jurisdictional prerequisite to a compulsory pooling order. *Carson v. Railroad Commission*, 669 S.W.2d 315, 316 (Tex.1984); Tex.Nat.Res.Code Ann. § 102.013(b) (Vernon 1978). The supreme court has declined to define a fair and reasonable offer, but the court has instructed that "the offer must be one which takes into consideration those relevant facts, existing at the time of the offer, which would be considered important by a reasonable person in entering into a voluntary agreement concerning oil and gas properties." *Carson*, 669 S.W.2d at 318.

*Id.* at 678.

Appellant argues that Southwest's offer cannot be considered fair and reasonable because it intentionally included acreage within its offer which it knew was outside the productive limits of the field. As a basis for its statement that Southwest in-

tentionally included acreage outside the productive limits of the field, appellant relies upon data presented by Southwest at the temporary field rule hearing before the Commission on July 28, 1983, and then states that "both American and Southwest agreed that all or part of" certain numbered lots were "not productive." It then states "that *nearly four weeks prior* to making an offer to pool voluntarily, Southwest *knew* that its offer to pool would include acreage which Southwest believed to be nonproductive in the field." (emphasis appellant's).

■ Appellees challenge the correctness of these assertions, and the Commission points out that the purpose of temporary field rule hearings is not to determine whether acreage is productive but to attempt to determine how many acres a well will efficiently drain. Temporary field rule hearings are called when the field is new and the extent of its productive limits is still unknown. The exact productive limitations of the field are therefore not then at issue.

■ The evidence shows that neither American nor Southwest was in agreement as to the respective productive acreage of the other because the productive limits of the 10,000 plus feet deep field were controlled by several factors—a fault defining the northern boundary, gas-water contact defining the western boundary and a shale out line defining the southern and eastern boundaries. Southwest discounts the importance of the fact that the offer to pool included a small amount of acreage outside of a field-bounding fault, stating it was included only because of the need to follow property lines in the area of the fault so the proposed unit could be described by metes and bounds.

We agree this is a reasonable approach. In a small new field it is impossible to describe the productive acreage with certainty. This is the function of the Commission after presentation of evidence at the MIPA proceeding. Appellant does not cite any authority nor does it offer any convincing argument that Southwest's offer to voluntarily pool was not fair and reason-

able under the circumstances presented by this record. The Commission found the offer was fair and reasonable, and it defined the productive acreage in the reservoir and ordered the unit formed on that basis.

■ Appellant next argues the offer was not fair and reasonable because it expressly negated any compensation to the working interest owners for the risk incurred in drilling the well. While Southwest's offer proposed that the owner of the tracts to become a part of the pooled unit share in the cost of drilling and completing the well on the basis of each owner's pro rata share of the acreage contributed to the new unit, it did not propose "a penalty for risk, or a penalty of any kind or character, because Southwest was not offered the opportunity to participate from the outset and its productive acreage has been drained by past production from the Lobit Et Al No. 1 Well."

Appellant argues that some nine of eleven wells drilled "in that area" had been dry holes and that the well in question had been completed "for more than a year and had been on production for eight months before Southwest made its offer to pool voluntarily. Obviously, Southwest waited until it was certain that the well would be a capable producer before making an offer to pool voluntarily into the Lobit Unit Well No. 1." Therefore, American argues, after Southwest waited until the venture was no longer a risk before offering to participate in the well, the specific exclusion of a risk penalty from Southwest's offer renders the offer not fair and reasonable. Appellant also points out that even the Commission found the drilling of the subject well to be "high risk."

Contrary to appellant's contention, there is no evidence that Southwest waited until it was certain the well was a producer before making its offer to pool. Southwest did not even hold the acreage which it sought to pool until March 1983, some eight months after the subject well was placed on production. Further, the reason Southwest assigned in its offer for not proposing a risk penalty was not unreason-able. There is no statutory requirement that an offer to voluntarily pool contain a risk penalty. The Commission, in ordering pooling, complied with Tex.Nat.Res.Code Ann. § 102.052(a) (Vernon 1978) in providing for a 100% risk penalty in its final order. We hold that the offer was not unreasonable simply because it failed to include a risk penalty. *See Buttes Resources,* 732 S.W.2d at 678.

Third, appellant contends Southwest's offer was not made in a bona fide attempt to reach a voluntary pooling agreement. In support of this contention, appellant makes the same arguments already rejected, *i.e.,* inclusion of non-productive acreage in the offer and specific exclusion of risk compensation. No further discussion of this contention is necessary.

■ Under its final part of its first point of error appellant contends Southwest's voluntary pooling offer was not made to all of the interest owners in the proposed unit; therefore, appellant argues, "the District Court erred in holding that the Railroad Commission had jurisdiction to order compulsory pooling." We disagree. We said in *Buttes,*

> Nowhere in the act do we find a specific requirement that the applicant make the offer to *all* interest holders individually before making his application. Neither does it seem to have been the intent of the legislature that such a requirement be implied.

*Buttes Resources,* 732 S.W.2d at 679.

As in *Buttes,* Southwest made its offer "to American as operator of the unit and agent for all other interest owners in this unit." Additionally the offer stated: "If American does not have the authority to speak for their working interest partners and all royalty owners, please send us immediately the names and addresses of the other interest owners so that this same offer can be made to them." American responded, stating: "American Operating Company has authority to speak for the remaining interest owners in and to the units surrounding the captioned wells for purposes of negotiating with Southwest Minerals, Inc., in connection with offers to

pool by Southwest Minerals, Inc." Appellant's contention is without merit.

The purpose of the MIPA is to provide an incentive and an encouragement to voluntary pooling among parties. Southwest sent its initial letter of August 12, 1983, in a desire to begin negotiations for a voluntary pooling agreement between American and Southwest. This was American's ultimate response:

We will also reiterate the terms upon which American proposed that Southwest participate in the Lobit No. 1 Well and respective proration unit. This also tracks the proposal set out in our August 10, 1983, conversation.

(a) Southwest would have participated in its mutually agreed share of the unit consisting of 640 acres plus ten percent (10%) tolerance (the Field Rules are for 640 acres plus ten percent (10%)) after American has recouped its drilling, completing and operating expenses *plus* a charge of 100% for risk.

(b) Southwest, in the alternative, could have elected to receive a $\frac{1}{32}$ of eight-eighths (8/8ths) override after recoupment of drilling, completing and operating costs plus a 100% risk charge.

(c) In the alternative, Southwest could have elected to receive a one percent (1%) of the eight-eighths (8/8ths) overriding royalty currently (*i.e.*, the date an agreement was reached) and continue to receive same hereafter.

You have rejected all of the above proposals and, instead, made an offer which was contrary to the Field Rule size. No further offer is made at this time on the No. 1 well.

The fact that the MIPA was enacted to encourage voluntary pooling would seem to contemplate a process of negotiations among the parties. However, in this response American did not specifically point out where it had a dispute with Southwest's determination of productive acreage in the proposed unit in order to allow Southwest the opportunity to modify its offer. American did make a more extensive dispute with Southwest's determination of productive acreage as to the nearby Lobit No. 1–A Well. However, it made no similar contention as to the Lobit No. 1 Well involved in this appeal. American also did not quarrel with Southwest's apparent failure to initially make an offer to everyone who American now claims should have been notified in the first place.

Although the MIPA does not require that a counter-offer be made in response to a voluntary pooling offer, it is a factor which we consider in making a determination as to whether such an offer is a fair and reasonable offer under the Act. We hold that the statutory jurisdictional predicate of a fair and reasonable offer was satisfied when all of the relevant facts are examined in the light of the circumstances as they existed at the time the offer was made. We do note, however, that we are not here concerned with material and false representations intentionally made in the voluntary pooling offer. Accordingly, appellant's first point of error is overruled.

 In its second point of error appellant contends the district court erred "in affirming the final order of the Railroad Commission because the Commission failed to give notice of its hearing as required by law."

Tex.Nat.Res.Code Ann. § 102.016 (Vernon 1978) provides:

On the filing of an application for pooling of interests into a unit under the provisions of this chapter, at least 30 days notice before hearing on the application shall be given to all interested parties, including notice by publication if there are unknown owners or owners whose whereabouts are unknown. The notice shall be given in the manner and form prescribed by the commission.

The Commission's finding of fact No. 1 is:

Notice of the application of Southwest Minerals, Inc. for the inclusion of a 54.9–acre tract into the Lobit Gas Unit Well No. 1 was issued in the form and manner prescribed by the Commission.

a. Copies of the notice were mailed to all known owners of mineral interest in the Lobit Gas Unit Well No. 1 and to all interested parties at least 30 days prior to the date of hearing.

b. Notice by publication was also accomplished by publishing the Commission's Notice of Hearing in this docket in the *Galveston Daily News,* a newspaper of general circulation in Galveston County, on October 4, 11, 18, and 25, 1983, the first date of such publication being at least thirty (30) days prior to the date of the hearing.

Appellant does not directly attack this finding but states that the Commission "failed to provide notice to all of the oil and gas interest owners in Southwest's proposed unit." Appellant argues that the requirement of § 102.016 that notice be given to "all interested parties" requires that notice be given to the owners of the interests, *represented by the lessor, that are sought to be pooled* within the existing unit. Again, appellant does not cite any authority nor is any convincing argument made in support of the assertion.

On the other hand, the Commission argues:

Unlike the mineral interest owners in the voluntarily pooled Lobit Unit, the mineral interest owners being forced pooled into the Lobit Unit were not faced with a possible deprivation of a property right by exclusion of the nonproductive parts of their respective tracts from the unit. The Commission's final order could only affect the rights of possession and development of the acreage that the Commission would pool into the existing unit. The rights to the unpooled portion could not be affected.

We agree, and hold that where a lessee's interest (here Southwest's) is affected in the same way as its royalty interest owner's (here Southwest's lessors), such royalty interest owners can be represented by the lessee (here Southwest) at the Railroad Commission hearing. *See Railroad Comm'n v. Graford Oil Corp.,* 557 S.W.2d 946, 954 (Tex.1977). Furthermore, appellant has no standing to challenge the lack of *personal* notice to Southwest's lessors. *See Determan v. City of Irving,* 609 S.W.2d 565, 568 (Tex.App.—Dallas 1980, no writ). The notice by publication, as prescribed by the Commission, as well as Southwest's representation, is sufficient in this case. Appellant's second point of error is overruled.

In its third point of error appellant contends the forced pooling order of the Commission "deprives the working interest owners of their fair share of production."

The complained of portion of the order provides:

3. For the purpose of determining the portions of production owned by the persons owning interests in the pooled unit by virtue of this order, the production shall be allocated to the respective tracts within the unit in the proportion that the number of surface acres included within each tract bears to the number of surface acres included in the entire unit. The interests pooled voluntarily will share in production on the basis of their private contractual agreement.

As previously stated, prior to the entry of the Commission's final order, the production from the well in question was distributed to the mineral interests comprising the voluntarily pooled 694–acre Lobit unit pursuant to a unit declaration dated January 14, 1982. Appellant argues that the above-quoted paragraph 3 required "American to allocate 100% of the production proceeds to the interests owners in the existing 694–acre Lobit Unit and to allocate *another 100%* of the production proceeds to the interests owners in the new 258.1–acre Lobit Unit established by the Order." (emphasis appellant's). Appellant states this deprives the working interest owners of their fair share of production because "[t]he money for the additional payments will have to come from the working interest owners' fair share of production." Further, appellant argues that, in effect, the Commission's order recognizes two pooled units in violation of § 102.001 which authorizes the commission to establish only one unit. We do not agree.

Section 102.017(a) of the MIPA provides that all Commission orders affecting pooling shall be made on terms and conditions that are fair and reasonable and will afford the owner or owners of each tract or interest in the unit the opportunity to produce

or receive his fair share. Section 102.018 provides that the Commission can force pool only productive acreage. Section 102.051 provides that for the purpose of determining the portion of production owned by the person owning interests in the pooled unit, the production shall be allocated to the respective tracts within the unit in the proportion that the number of surface acres included within each tract within the unit bears to the number of surface acres included in the entire unit.

The Commission's order complies with all these sections. Appellant's complaint evidently concerns the last sentence of paragraph three where the Commission attempts to recognize the already voluntarily pooled interests. Of course, the Commission was without authority to order the dissolution of the voluntarily pooled unit. However, the Commission did have the statutory authority to undertake the action which it did. *See* Tex.Nat.Res.Code Ann. § 101.015 (Vernon 1978). Appellant's third point of error is overruled.

■ In its fifth point of error appellant contends "[t]he district court erred in affirming the final order of the Railroad Commission because the order fails to describe the property being pooled," as required by § 102.017(b)(1). The Commission challenges our consideration of this point because this contention "was not advanced by American in its motion for rehearing," therefore, error has not been preserved. We agree. In a hearing subject to the Administrative Procedure and Texas Register Act, as is a Railroad Commission hearing, an appellant's motion for rehearing should set forth all of the errors complained of in order to preserve them for appeal. *Suburban Util. Corp. v. Public Util. Comm'n,* 652 S.W.2d 358, 365 (Tex. 1983); Tex.Rev.Civ.Stat.Ann. art. 6252–13a, § 16(e) (Vernon Supp.1986). Appellant's fifth point of error is overruled.

■ In its fourth point of error appellant contends the Commission order is unconstitutionally retroactive. As previously stated, the Commission's final order was entered March 25, 1985, but was made effective January 14, 1984.

In *Buttes Resources,* 732 S.W.2d at 682, we held that the Railroad Commission is without authority to make such an order effective prior to the time it is signed. We adhere to that holding. We modify the final order of the Railroad Commission to make it effective as of March 25, 1985.

In all other respects, the judgment is affirmed.