AETNA BAS MAJORITY 



TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-93-00541-CV







Aetna Casualty and Surety Company, Appellant



v.



The State Board of Insurance and Texas Workers' Compensation 


Insurance Facility, Appellees







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT


NO. 92-15877, HONORABLE MARGARET A. COOPER, JUDGE PRESIDING








 Appellant Aetna Casualty & Surety Company brought suit for judicial review of
an order of the State Board of Insurance (1) (the "Board") denying Aetna's claim for a servicing
carrier fee from the Texas Workers' Compensation Insurance Facility (the "Facility"). See Tex.
Ins. Code Ann. art. 5.76-2, § 2.08(d) (West Supp. 1995). The district court affirmed the Board's
order. On appeal, Aetna brings six points of error complaining that the Board's action was not
supported by substantial evidence, was arbitrary and capricious, and was made through unlawful
procedure. We will affirm the trial court's judgment.



FACTUAL AND PROCEDURAL BACKGROUND


 The Facility is a private, non-profit, unincorporated association of insurers
authorized to write workers' compensation insurance in Texas for employers who are unable to
obtain coverage through private insurance companies. (2) The Facility is required to provide
insurance coverage for any risk that appears to be "in good faith entitled to insurance." Tex. Ins.
Code Ann. art. 5.76-2, § 4.02(b) (West Supp. 1995). Aetna and the Facility entered into an
agreement by which Aetna became a servicing carrier for the Facility. As a servicing carrier,
Aetna issued and serviced insurance policies on behalf of the Facility, including auditing and
collecting all premiums due. Pursuant to the Facility's procedural rules, by which Aetna agreed
to be bound, the Facility would pay Aetna a servicing fee "on premiums collected prior to
returning to the [Facility] office a premium item as uncollectible." Conversely, the Facility would
not pay a servicing fee "on premiums returned as uncollectible, even though later collected by the
[Facility] office, attorney, collection agency, or otherwise paid."

 As the servicing carrier, Aetna provided workers' compensation insurance coverage
for Tra-Jax, Inc. from 1987 to 1990. By letter dated August 29, 1990, an Aetna accounts
processor notified the Facility in a routine filing that Tra-Jax's premium of $466,634 for the
policy year 1989-90 had not been paid and that "this account has been marked off as uncollectible
and there is no current coverage in force." At about the same time, Aetna and the Facility learned
of possible fraudulent activity by Tra-Jax. The Facility agreed to pay for an outside auditing firm
and outside legal counsel to investigate and file suit against Tra-Jax. This investigation revealed,
among other things, that Tra-Jax owed more than $300,000 in underpaid premiums for the 1988-89 policy year, in addition to the amounts owed for the 1989-90 policy year. Aetna and the
Facility together filed suit against Tra-Jax. Eventually, a settlement was reached in which Tra-Jax
agreed to pay a total of $863,000 to Aetna and the Facility. Aetna endorsed the settlement check
and forwarded it to the Facility with a request for its standard 26.5% servicing fee. The Facility
accepted the settlement check, but denied Aetna's fee request, claiming that Aetna had returned
the account as uncollectible and had accepted legal fees not authorized for a servicing carrier,
thereby waiving its servicing fee. On appeal, the Board affirmed the Facility's decision. Aetna
then brought this suit for judicial review. The trial court affirmed the Board's decision.



THE DISPUTE


 Aetna disputes that it ever abandoned collection of the Tra-Jax premiums. After
a whistleblower revealed that Tra-Jax had defrauded the Facility by misclassifying a large number
of employees in high risk positions as "clerical workers" to avoid high workers' compensation
insurance premiums, (3) Aetna filed suit against Tra-Jax and two solvent co-shareholders on behalf
of Aetna and the Facility. Aetna asserts that its lawyers, with expertise in investigating insurance
fraud, directed the suit and successfully negotiated a settlement of $863,000, representing
$320,710 in premiums due for 1988-89, $466,634 in premiums due for 1989-90, plus expenses
of $75,656. (4) Aetna insists that it would have had no incentive to file a lawsuit in its own name,
or in the Facility's name, if it had not expected to collect its usual servicing allowance. The sum
in controversy is 26.5% of $787,344, the total premiums collected, which produces a fee of
$208,646.

 Aetna admits that its clerk notified the Facility that Aetna was abandoning Tra-Jax's
premium for 1989-90 as uncollectible, but explains that this was just a "routine" form letter sent
by a low-level employee with "no decision-making authority." Aetna also notes that there is no
such formal letter of referral declaring the 1988-89 premium uncollectible. Until the fraud was
discovered, Aetna believed that Tra-Jax had failed to pay its premium only for 1989-90 and did
not suspect that Tra-Jax had underpaid its premium for 1988-89. Aetna argues that its aggressive
role in investigating the fraud, filing the lawsuit, and negotiating a beneficial settlement for the
Facility demonstrates that Aetna never abandoned Tra-Jax's premiums in either policy year and
therefore had a reasonable expectation of collecting its ordinary servicing fee.

 The Facility relies on the rules set forth in its Procedural Handbook to argue that
despite its other actions, Aetna waived its right to collect a servicing fee on the Tra-Jax premiums. 
The Board agreed. It concluded that under the procedural rules governing servicing companies, 
Aetna waived any right to collect its servicing fee by declaring the Tra-Jax account uncollectible
and referring it to the Facility for collection, and by allowing the Facility to pay legal and
accounting fees incident to collection that are ordinarily an expense of the servicing carrier.



DISCUSSION


 In its first four points of error, Aetna asserts that the Board's order is not supported
by substantial evidence and is arbitrary and capricious. See Administrative Procedure Act
("APA"), Tex. Gov't Code Ann. § 2001.174(2)(E), (F) (West 1995). Specifically, Aetna
complains of the Board's findings and conclusions that Aetna designated the account as
uncollectible and that Aetna waived its right to a fee by allowing the Facility to pay legal and audit
fees to outside firms.

 In conducting a substantial-evidence review, we must first determine whether the
evidence as a whole is such that reasonable minds could have reached the conclusion the agency
must have reached in order to take the disputed action. Texas State Bd. of Dental Examiners v.
Sizemore, 759 S.W.2d 114, 116 (Tex. 1988), cert. denied, 490 U.S. 1080 (1989); Texas Health
Facilities Comm'n v. Charter Medical-Dallas, Inc., 665 S.W.2d 446, 453 (Tex. 1984). We may
not substitute our judgment for that of the agency and may consider only the record on which the
agency based its decision. Sizemore, 759 S.W.2d at 116. The appealing party bears the burden
of showing a lack of substantial evidence. Charter Medical, 665 S.W.2d at 453. The appealing
party cannot meet this burden merely by showing that the evidence preponderates against the
agency decision. Id. at 452. Agency decisions that are not supported by substantial evidence are
deemed arbitrary and capricious. Public Util. Comm'n v. Gulf States Utils. Co., 809 S.W.2d 201,
211 (Tex. 1991); Charter Medical, 665 S.W.2d at 454.

 The Facility's Procedural Handbook established the following procedures regarding
servicing carrier fees:



23. COLLECTION POLICY


 A. Servicing Carriers


 . . . .


 (3) If the servicing carrier cannot collect monies due, it will refer the
item to the [Facility] for collection within ten (10) days. The
servicing carrier by this action waives any right to a servicing
allowance on any monies due which are subsequently collected. .
. .


32. SERVICING COMPANY ALLOWANCE


 . . . .


 The Servicing Allowance is to be paid on premium collected prior to
returning to the [Facility] Office a premium item as uncollectible. No
Servicing Allowance will be paid on premiums returned as uncollectible,
even though later collected by the [Facility] Office, Attorney, Collection
Agency, or otherwise paid.



 The Facility relies on the following series of letters as evidence that Aetna had
returned the Tra-Jax account as uncollectible: (1) On June 20, 1990, Pamelia Pride, an Aetna
accounts processor, notified Tra-Jax that its account would be referred to the Facility for
collection if its payment of $466,634, due from a final audit, was not received within ten days;
(2) on August 29, 1990, Pride sent a memorandum to the Facility that Tra-Jax's account had been
marked off as uncollectible and that there was no current coverage in force (referring to policy
year 1989-90); (3) on October 11, 1990, the Facility Collections Department sent a letter to Tra-Jax demanding payment within ten days for the $466,634 premium that was due and in default for
1989-90 and copied Aetna on this correspondence; (4) on November 3, 1990, the Facility referred
the account to its outside legal counsel, requesting that counsel take the necessary legal steps to
collect Tra-Jax's debt in the amount of $466,634; (5) on November 8, 1990, the Facility's
collections clerk asked Aetna to immediately furnish its auditor's worksheets for the Tra-Jax
account so the matter could be turned over to the Facility's counsel. 

 Under the rules of the Procedural Handbook outlined above, Aetna was entitled to
a servicing allowance on all premiums received for which it was the servicing carrier, unless it
had referred the account to the Facility as uncollectible. Thus, in order to avoid its obligation to
pay Aetna the agreed-upon percentage as a servicing allowance, the Facility had the burden to
prove that the account had been returned to it as uncollectible. See Travelers Ins. Co. v. Brown,
402 S.W.2d 500, 504 (Tex. 1966) ("One who is relieved of his contractual obligations by a
contingent event or occurrence has the burden of proving the happening of the event or
occurrence.").

 Although there was no formal referral of the premium for 1988-89, the Facility
learned of Tra-Jax's fraudulent misreporting and underpayment for that year (and possibly earlier
years) only after Aetna referred the Tra-Jax account to the Facility as uncollectible. There is other
evidence in the record on which the Board could have relied in determining that Aetna had
returned Tra-Jax's account for the Facility to collect whatever sums were due and payable. The
record reveals that only one lawsuit was filed to investigate Tra-Jax's fraudulent and wrongful
underpayment of premiums. We conclude that the letters relied on by the Facility, read in
conjunction with the Procedural Handbook, constitute substantial evidence that Aetna returned the
Tra-Jax account to the Facility as uncollectible. 

 The Facility reimbursed Aetna $67,000 for outside legal fees and auditing fees
incurred in pursuing the lawsuit against Tra-Jax and its co-shareholders. Aetna vehemently denies
that it ever agreed to waive its servicing fee in exchange for the Facility's fronting these expenses. 
Aetna argues persuasively that it would never have pursued the lawsuit if it had not had a stake
in recovering a percentage of the premiums collected. Aetna also implies that it would never have
agreed to accept $67,000 in legal and auditing fees in exchange for $208,646 in servicing fees. 
However, the evidence as to the parties' agreement is conflicting. On August 16, 1990, the
Facility's executive director assured Aetna of the Facility's eagerness to assist in the investigation: 
"As a part of supporting Aetna in this effort, the [Facility] would be happy to share in the expense
of this investigation." On August 29, John Luthringer of Aetna responded, "I understood that the
[Facility] would reimburse Aetna for all of our expenses on this matter. Did I misunderstand
you?" On October 1, Charles MacKay of the Facility could not recall any such agreement: "It
seems to me, John, that Aetna should be expected to at least carry the burden of paying for your
own internal expense since in my opinion this would be considered an ordinary expense under
your servicing carrier contract." If substantial evidence supports either an affirmative or negative
finding that Aetna waived its right to collect a servicing fee, we must resolve any ambiguities in
favor of the agency decision. See Auto Convoy Co. v. Railroad Comm'n, 507 S.W.2d 718, 722
(Tex. 1974). "Resolution of factual conflicts and ambiguities is the province of the administrative
body and it is the aim of the substantial evidence rule to protect that function." Firemen's &
Policemen's Civil Serv. Comm'n v. Brinkmeyer, 662 S.W.2d 953, 956 (Tex. 1984).

 Here the agency decision comports with the Facility's procedural rules that a
servicing company is not entitled to reimbursement for legal fees (and by analogy other expenses)
incurred in the collection of premiums. As a carrier, Aetna is charged with knowledge of the
Facility's Servicing Company Agreement, which provides:



All costs and expenses incident to its functions as a Servicing Company and the
servicing of risks assigned to it, including but not limited to office maintenance,
salaries, personnel expenses, and the payment of premium tax and bureau
assessments, shall be paid by Carrier except that the following expenses shall be
recoverable from the [Facility]: authorized legal expenses as defined in the
[Facility's] Procedural Handbook. 



The Procedural Handbook authorizes legal expenses incurred in litigating liability for claims filed
under the workers' compensation policy issued, but does not authorize legal fees incurred in
collecting a premium, which is one of the duties the servicing carrier assumes in exchange for
receiving a servicing fee. The record of the hearing before the Board reflects that the Board relied
on Aetna's acceptance of reimbursement for legal expenses and auditing expenses as evidence that
it had turned over to the Facility the collection of premiums on the Tra-Jax account. If legal fees
incurred in collecting a premium are properly the expense of a servicing carrier, Aetna was not
entitled to accept such reimbursement and still claim a servicing fee. It seems harsh to deny Aetna
$208,646 in fees because it asked for and received $67,000 in legal fees it was not entitled to
receive. A reviewing court, however, does not sit to substitute its judgment for the agency's
decision. We are not called upon to determine whether the decision was correct, but whether
reasonable minds could have reached the Board's decision on the record evidence, including
evidence of the Facility's procedural rules. The Board determined that accepting legal fees was
inconsistent with a carrier's obligation to bear the expenses of premium collection and thus
constituted a waiver of the servicing fee. See North Alamo Water Supply Corp. v. Texas Dep't
of Health, 839 S.W.2d 448, 455 (Tex. App.--Austin 1992, writ denied) (agency's interpretation
of its own rules is entitled to substantial weight). We hold that the Board could reasonably
conclude that Aetna waived its right to accept a servicing fee on the premiums recovered by
accepting legal fees that are not authorized to be paid to a servicing carrier. Because there is
substantial evidence in the record to sustain the Board's denial of Aetna's servicing fee on the Tra-Jax premiums, we overrule Aetna's first four points of error.

 In its fifth and sixth points of error, Aetna challenges the Board's action in rejecting
the hearings officer's proposal for decision without explanation as being arbitrary and capricious
and an unlawful procedure. The record reflects that the hearings officer prepared a proposal for
decision that would have awarded Aetna its fee for the 1988-89 policy year and denied it for the
1989-90 policy year. The Board rejected this proposal, however, and issued an order denying all
relief to Aetna. The Board's final order does not explain directly why the proposal for decision
was rejected. Aetna contends that "[w]hile the Board is not compelled to adopt a Proposal for
Decision submitted to it, it is required to explain the reason and basis for its rejection of the
recommendation of its own Hearings Officer."

 A hearings officer has no power to bind an agency with a proposal for decision. 
Ross v. Texas Catastrophe Property Ins. Ass'n, 770 S.W.2d 641, 642 (Tex. App.Austin 1989,
no writ). Thus, an agency is free to reject a hearings officer's proposal for decision. In the
present case, the final order of the Board did not adopt any portion of the hearings officer's
proposal. The APA contains no provision directing the Board to explain its reasoning in rejecting
the report of its hearings officer. (5) In reviewing an agency's decision, we examine the agency's
final order and any statements in reports that were adopted by the agency in its final order. See
Public Util. Comm'n v. AT&T Communications, 777 S.W.2d 363, 366 (Tex. 1989). We are not
permitted to impose additional fact-finding requirements or otherwise require an agency to explain
its reasoning beyond the requirements of the APA, even if judicial review would be thereby
enhanced. Charter Medical, 665 S.W.2d at 451; Buttes Resources Co. v. Railroad Comm'n, 732
S.W.2d 675, 682 (Tex. App.Houston [14th Dist.] 1987, writ ref'd n.r.e.).

 Although not required to do so, the Board explained its rejection of the hearings
officer's proposal in a manner that facilitates our review of its final order. The Findings of Fact
and Conclusions of Law reflect the Board's conclusion that Aetna waived its right to any servicing
fee under the applicable procedural rules both by declaring the Tra-Jax account uncollectible and
by allowing the Facility to pay outside legal and audit fees incident to collecting the sums owed
by Tra-Jax. Only one lawsuit was filed to investigate fraud and collect premiums from Tra-Jax;
the Facility reimbursed Aetna $67,000 for legal and audit fees incurred in pursuing this single
cause of action. The Board's conclusion that by accepting unauthorized legal fees Aetna waived
its servicing fee on any sums collected in the lawsuit explains the Board's denial of any fee,
without distinction between the policy years. We agree with the trial court that there was
sufficient evidence in the record to sustain the Board's decision and overrule points of error five
and six.



CONCLUSION


 We affirm the district court's judgment and uphold the Board's order denying Aetna
its servicing fee on the Tra-Jax premiums.



 Bea Ann Smith, Justice

Before Justices Powers, Jones and B. A. Smith

Affirmed

Filed: May 3, 1995

Publish

1.   The duties of the former State Board of Insurance are now performed by the
Commissioner of Insurance or the Texas Department of Insurance, consistent with their
respective powers and duties set forth in the Insurance Code. See Tex. Ins. Code Ann.
arts. 1.01A, .02 (West Supp. 1995); see also Act of May 27, 1991, 72d Leg., R.S., ch. 242,
§ 13.01, 1991 Tex. Gen. Laws 939, 1133.
2.   The insurer of last resort in Texas has changed names several times. Most
documents in the instant cause refer to the association by its former name, the Texas
Workers' Compensation Assigned Risk Pool. The Facility replaced the Pool effective
January 1, 1991. Act of Dec. 11, 1989, 71st Leg., 2d C.S., ch. 1, § 17.09(1), 1989 Tex.
Gen. Laws 1, 117. On January 1, 1994, the Texas Workers' Compensation Insurance
Fund replaced the Facility. Act of Aug. 25, 1991, 72d Leg., 2d C.S., ch. 12, § 18.24(b),
1991 Tex. Gen. Laws 252, 362, as amended by Act of May 26, 1993, 73d Leg., R.S., ch.
885, § 8(b), 1993 Tex. Gen. Laws 3512, 3515.
3.   Two factors are used to assess risk in the calculation of workers' compensation
insurance premiums: (1) employees are classified according to the risk of the work
performed (e.g., carpenters are assigned a higher risk factor than clerical workers); and (2)
employers are rated according to their safety record in terms of claims filed. Premium rates
based on employee job classification are listed in the Texas Basic Manual of Rules,
Classifications and Rates for Workers Compensation and Employers' Liability, a manual
promulgated by the Department of Insurance.
4.   Aetna maintains that the Facility's lawyers played a minor supporting role as local
counsel for Aetna's out-of-state attorneys who completely controlled the investigation and
settlement efforts.
5.   We note that the APA does provide that a state agency may change findings of fact
or conclusions of law made by an administrative law judge employed by the State Office
of Administrative Hearings only for reasons of policy and must state in writing the reason
and legal basis for such a change. APA § 2001.058(e). However, the APA contains no
similar requirement for other hearings officers. The record reflects that the hearings
officer in this case was not employed by the State Office of Administrative Hearings.