**GULF STATES UTILITIES COMPANY, Office of Public Utility Counsel, and Public Utility Commission, Appellants,**

v.

**COALITION OF CITIES FOR AFFORDABLE UTILITY RATES, et al., Appellees.**

No. 3–92–046–CV.

Court of Appeals of Texas, Austin.

Aug. 31, 1994.

Rehearing Overruled Oct. 12, 1994.

John Williams, Barry Bishop, Clark, Thomas, Winters & Newton, Austin, for Gulf States Utilities Co.

Stephen Fogel, Office of Public Utility Counsel, Dan Morales, Atty. Gen., Susan Bergen Schultz, Asst. Atty. Gen., Austin, for Public Utility Com'n.

Geoffrey M. Gay, Butler, Porter, Gay & Day, Austin, for Cities of Beaumont, Bevil Oaks, Bridge City, China Groves, Nederland, Nome, Orange, Port Arthur, Port Neches, Rose City, Silsbee, Sour Lake and Vidor.

Jim Boyle, Boyle & Bender, Austin, for Coalition of Cities for Affordable Utility Rates.

Charles L. Lacallade, Brown & Lacallade, P.C., Austin, for North Star Steel Tex., Inc.

Jonathan Day, Major, Day, Caldwell & Keeton, L.L.P., Houston, for Tex. Indus. Energy Consumers.

Before POWERS, ABOUSSIE and B.A. SMITH, JJ.

## ON SECOND MOTION FOR REHEARING

BEA ANN SMITH, Justice.

We withdraw the opinion and judgment of this Court dated May 25, 1994, and substitute the following in its place.

The Public Utility Commission of Texas, the Office of Public Utility Counsel, and Gulf States Utilities Company appeal from a district-court judgment rendered in a suit for judicial review of the Commission's final order in an electric-utility rate case conducted under the Public Utility Regulatory Act (PURA), Tex.Rev.Civ.Stat.Ann. art. 1446c (West Supp.1994).[1] The district-court judgment reverses the Commission's final order and remands the case to the Commission with instructions. We will affirm the district-court judgment in part, reverse it in part, and render judgment affirming the Commission's order. *See* Administrative Procedure Act ("APA"), Tex.Gov't Code Ann. §§ 2001.174, .901(a) (West 1994); Tex. R.App.P. 80(b).[2]

---

1. The appellees are the municipalities of Huntsville, Conroe, Panorama Village, Somerville, West Orange, Willis, and Cut And Shoot, under the name "Coalition of Cities for Affordable Utility Rates"; the municipalities of Beaumont, Bevil Oaks, Bridge City, China Groves, Nederland, Nome, Orange, Port Arthur, Port Neches, Rose City, Silsbee, Sour Lake, and Vidor; Big Three Industries, Chevron Chemical Company, E.I. duPont de Nemours & Co., Firestone Synthetic Rubber & Latex Co., Goodyear Tire & Rubber Co., Mobil Chemical Company, Olin Corporation, PD Glycol, Texaco Chemical Company, Temple–Eastex, Inc., Union Carbide Corporation, and Union Oil Company of California, under the name "Texas Industrial Energy Consumers"; and North Star Steel of Texas, Inc. The

Commission and the Office of Public Utility Counsel are also appellees with respect to certain parts of the trial-court judgment, but they also bring their own appeal from certain other aspects of the judgment. We will refer to all the foregoing as "appellees" except when we consider the appeals taken by the Commission and the Office of Public Utility Counsel.

2. All citations in this opinion are to the current Administrative Procedure Act rather than the former Administrative Procedure and Texas Register Act because the recent codification did not substantively change the law. Act of May 4, 1993, 73d Leg., R.S., ch. 268, § 47, 1993 Tex. Gen.Laws 583, 986.

## THE CONTROVERSY

Gulf States erected a new power-generating facility, the River Bend Nuclear Generating Station, and initiated in the Commission a contested case seeking the agency's adjudication regarding what portion of its total construction costs the utility might include in its rate base as being a "prudent" investment.[3] The Commission consolidated that proceeding with a rate case Gulf States had filed in the agency. The consolidated case is now before us following the Commission's final order and the district court's judgment on judicial review of that order.

The Commission determined in its final order that Gulf States was entitled to include in its rate base $2.273 billion of its construction costs on the River Bend project, that being the portion of total costs meeting the criterion of a prudent investment. The Commission also found the Gulf States failed to meet its burden of proving that capital costs "above a reasonable Definitive Cost Estimate of $2.273 billion were reasonably and prudently incurred." Conclusion of Law 18A. The Commission's final order declared that the agency would not presently include an additional $1.453 billion in rate base as a prudent investment. However, the Commission declared it would "reexamine on rehearing or in a subsequent proceeding the prudence and reasonableness of those River Bend construction costs regarding which the evidence is inadequate to support a finding of either prudence or imprudence."

Various parties filed their motions for rehearing in the Commission. *See* APA § 2001.145. These were overruled by operation of law. Several parties then sued in district court, as authorized by PURA section 69, seeking direct judicial review of the Commission's final order. Concurrently, Gulf States filed in the Commission a new contested case to address the $1.453 billion not included in rate base in the previous order.

## COLLATERAL ATTACK

Almost before direct judicial review began, the Office of Public Utility Counsel and twelve municipalities sued the Commission in district court in a cause independent of the various suits for judicial review brought under PURA section 69. These plaintiffs prayed for declaratory judgment that the Commission lacked the power to reconsider, in a separate contested case, the prudence of the $1.453 billion expenditure which had already been considered in this proceeding. An action taken by an administrative agency in excess of its statutory powers is the well-recognized exception to the general rule that an agency's final order, like the final judgment in a court of justice, is immune from collateral attack.[4] *Westheimer Indep. Sch.*

---

3. The "prudent investment test" with which we deal in the present appeal is not explicitly set out in PURA. *Cf.* PURA 41(a) (construction work in progress). Its origin is well described, we believe, in the brief furnished us by Coalition of Cities for Affordable Utility Rates:

> [T]he "prudent investment test" is subsumed within the traditional ratemaking principles embodied in PURA, Sections 38, 39 and 41, and that any imprudent expenditures can and should be disallowed; ... The source of the prudent investment test was Justice Brandeis's concurring opinion in *Missouri ex rel. Southwestern Bell Tel. Co. v. Public Service Commission;* he stated that "dishonest or obviously wasteful or imprudent" expenditures could Constitutionally be excluded from a utility's rate base. 262 U.S. 276, 43 S.Ct. 544, 67 L.Ed. 981 (1927 [1923]). In one of the seminal cases applying the prudent test, the New York Appeals Court stated, "It is neither just nor reasonable for a utility's customers to bear the cost of inefficient management or poor planning." *Long Island Lighting Co. v. Public Service Commission of the State of New York,*

134 A.D.2d 135, 523 N.Y.S.2d 615, 620 (3 Dept.1987).

4. In PURA § 69, the legislature provided a means for attacking *directly* the legality of the Commission's final order in a contested case: "Any party to a proceeding before the commission is entitled to judicial review under the substantial evidence rule." A suit under this statute is unknown to the common law. The suit must be brought, within a specified period of time, in a district court of Travis County, against the Commission as defendant; there is no jury; the record of agency proceedings must be admitted in evidence; and the court must ordinarily determine from such record alone whether to award one of two kinds of relief—it may affirm the Commission decision (in whole or in part) or reverse the Commission decision and remand the case to the agency for any of six specified errors of law. APA § 2001.171–.176. A suit under PURA § 69, governed by APA sections 2001.171–.178, is the exclusive method by which a Texas court may review the legality of actions taken by the Commission, with one exception: A suit for

*Dist. v. Brockette,* 567 S.W.2d 780, 785–87 (Tex.1978). Ancillary to their suit for declaratory relief, these plaintiffs requested a permanent injunction restraining the Commission from conducting any further proceedings addressing the prudence of the $1.453 billion expenditure. The district court granted the permanent injunction after trial.[5]

The plaintiffs ultimately prevailed in their collateral attack upon that part of the Commission's order which purported to defer until a subsequent proceeding an adjudication regarding the $1.453 billion. *Coalition of Cities for Affordable Util. Rates v. Public Util. Comm'n,* 798 S.W.2d 560 (Tex.1990), *cert. denied,* 499 U.S. 983, 111 S.Ct. 1641, 113 L.Ed.2d 736 (1991). The parties' competing arguments in the present appeal rest largely upon their conflicting interpretations of the supreme court's opinion in *Coalition of Cities.* We should therefore address that opinion before proceeding further.

In *Coalition of Cities,* the supreme court gave the following rationale in sustaining the plaintiffs' collateral attack:

1. The Commission's order in the rate case consolidating docket numbers 7195 and 6755 constituted a final adjudication of the amount of River Bend capital costs prudently and reasonably incurred; that amount excluded $1.453 billion because Gulf States had failed to bear its burden of proof as to the prudence of those expenditures.[6]

2. The Commission lacked the statutory power to revisit its determination concerning the prudence of the $1.453 billion expenditure.[7]

3. Therefore, the Commission exceeded its statutory power in concluding that it could reexamine in a future agency proceeding the prudence of the costs on which Gulf States had failed to bear its burden of proof—the $1.453 billion expenditure.[8]

---

declaratory or injunctive relief will lie when the Commission acts in excess of its statutory authority or "jurisdiction." *Westheimer Indep. Sch. Dist. v. Brockette,* 567 S.W.2d 780, 785–87 (Tex. 1978). Aside from this exception, the Commission's final orders are immune from collateral attack. *See Alamo Express, Inc. v. Union City Transfer,* 158 Tex. 234, 309 S.W.2d 815, 827 (1958); *Thompson v. Railroad Comm'n,* 150 Tex. 307, 240 S.W.2d 759, 763 (1951); 2 Frank E. Cooper, *State Administrative Law* 631–40 (1965); 2 Am.Jur.2d Administrative Law § 494, at 301 (1962).

5. The plaintiffs did *not* sue in *Coalition of Cities* to set aside the Commission decision and remand the case to the agency; in other words, they did *not* sue under PURA § 69 in a direct attack upon the Commission's final order in the rate case we now review. They sued instead, in a *collateral attack* upon that order, for declaratory and injunctive relief that would restrain the Commission from hearing and adjudicating Gulf State's contested case brought subsequently to adjudicate the prudence of the $1.453 billion that the Commission purported not to have adjudicated by the final order in the previous rate case. The plaintiffs contended, as they were bound to do if their collateral attack was to be successful, that the Commission had exceeded its statutory power in the rate-case order by attempting to defer final adjudication of the $1.453 billion to a subsequent proceeding, which would constitute a second adjudication of the prudence of that expenditure.

6. " 'Every factual, legal and policy issue [bearing on the River Bend rate case] was thoroughly explored and canvassed,' during the ... hearings

that continued for 132 days...." *Coalition of Cities,* 798 S.W.2d at 561–62. The supreme court further explained:

Because of a "lack of sufficient evidence", the PUC, in its finding 164A, "excluded from plant in service" all "capital costs in excess of $2.273 billion." A party who fails to meet its burden of proof loses. The party who has the burden but fails to persuade the trier of fact is not entitled to a second trial to present more evidence. By stating that GSU failed to meet its burden of proof on the prudence of the $1.453 billion, the PUC effectively disallowed that amount from the rate base.

*Id.* at 563–64 (citations omitted).

7. [T]he PUC order must be considered final unless the PUC has the statutory power to defer and *reconsider* such critical issues. Such was the holding in *Sexton v. Mount Olivet Cemetery Ass'n,* [720 S.W.2d 129, 146 (Tex.App.—Austin 1986, writ ref'd n.r.e.) ], in which the Banking Commissioner sought to *revisit an issue determined in a prior order*

....

*Coalition of Cities,* 798 S.W.2d at 564 (emphasis added).

8. The only legislative authorization for PUC *reexamination of an earlier determination* concerns the power to revoke or amend a certificate of convenience and necessity under certain circumstances outlined in PURA section 62(a)....

Thus, limited by statute and lacking any inherent power, the PUC was powerless to defer its decision to a future proceeding.

....

Accordingly, we hold that the doctrines of *res judicata* and collateral estoppel bar a utility

4. All parties had a legal right to a straightforward adjudication, in the original rate case, regarding the prudence of the $1.453 billion expenditure.[9]

5. By its decision in the collateral attack, the supreme court did not intend to bar Gulf States' legal right to a fair adjudication of the prudence issue or to restrict the scope of judicial review of that adjudication.[10]

Upon this reasoning, the supreme court reversed the judgment of this Court and affirmed the district court's order that permanently restrained the Commission from proceeding with a new contested case initiated by Gulf States. To underscore the importance of the *Coalition of Cities* opinion to the outcome of this appeal, we note that the dissent arrives at its result based on its contradictory reading of that decision. The dissent insists that the prudence of the $1.453 billion of construction costs *has never been finally adjudicated. Gulf States Utils. Co. v. Coalition of Cities for Affordable Util. Rates,* 883 S.W.2d 739, 757 (Tex.App.—Austin 1994, no writ h.) (Powers, J., dissenting). This view was the basis for our earlier decision in *Coalition of Cities;* we reversed the trial court's injunction, holding that the principles of res judicata were inapplicable because the Commission, by deferring its consideration, had never finally adjudicated the prudence of the $1.453 billion. *Public Util. Comm'n v. Coalition of Cities for Affordable Util. Rates,* 777 S.W.2d 814, 817 (Tex.App.—Austin 1989), *rev'd, Coalition of Cities for*

*Affordable Util. Rates v. Public Utility Commission of Texas,* 798 S.W.2d 560 (Tex.1990). The supreme court reversed, basing its decision on the principles of res judicata. As both courts recognized, *res judicata principles would not apply unless there had been a final adjudication concerning the $1.453 billion. Coalition of Cities,* 798 S.W.2d at 564. There can be no dispute: the supreme court held that the matter has been finally adjudicated by the Commission. "More importantly, the PUC order must be considered final unless the PUC has statutory power to defer and reconsider." *Id.* The supreme court then ruled that the Commission exceeded its statutory authority in attempting to postpone its decision, and concluded, "Once the order in the initial docket became final, it was not subject to any further PUC review." *Id.* at 565. The dissent dismisses this language as mere *dicta,* ignoring that the finality of the Commission's adjudication was the very basis for the trial court's injunction and the supreme court's final ruling in *Coalition of Cities,* notwithstanding our intermediate decision holding otherwise. To insist now that this Court was right and the supreme court was wrong is to disregard the authority of the high court to whose decisions we are obliged to defer.

## THE DISTRICT–COURT JUDGMENT

Being thus advised by the supreme court's judgment in *Coalition of Cities,* the district court, in reviewing the agency's action in the original rate case, (1) reversed the Commis-

---

from relitigating before the PUC the prudence of its past investment for inclusion in that utility's rate base.
*Coalition of Cities,* 798 S.W.2d at 564, 565.

9. All parties were entitled to a straightforward decision from the PUC the first time this case was presented. Permitting relitigation offends the policy reasons supporting the doctrines of *res judicata* and collateral estoppel. Both a public utility and consumers benefit from a final decision about whether cost overruns at a power plant have been sufficiently justified. With a complex and controversial project like a nuclear power installation, a utility and its investors need a determination to prevent relitigation of the same previous investment decision on each occasion that a rate increase is requested. The same finality that benefits the utility investors can serve the interests of consumers who know that if

a utility is once denied relief because of its failure to prove its case, it may not return repeatedly on the same facts until the PUC yields.

*Coalition of Cities,* 798 S.W.2d at 565.

10. In *Coalition of Cities* the supreme court stated:

All issues relating to the merits of the administrative order, including the prudence of all elements of construction costs, remain to be addressed by the trial court [in the rate case where] the burden is upon [Gulf States] to show that the PUC's order is not supported by *substantial evidence.* The claim of the dissent that we have *at this point* "assess[ed] a $1.453 billion penalty (permanent disallowance) on GSU," ... is incorrect.

*Coalition of Cities,* 798 S.W.2d at 565 n. 7 (emphasis added).

sion's final order on an unstated ground, and (2) remanded the rate case to the Commission with an instruction directing the agency to "exclude from rate base the relevant statutory-law expenses" and another instruction forbidding the agency to "reduce rate base by $1.50 for each $1.00 of interim rate revenues collected." We have not yet discussed these two instructions. They pertain to issues raised in the appeals taken by the Commission and the Office of Public Utility Counsel. For the present, we need only note that the instructions impliedly exclude from the Commission's consideration, on remand, any reexamination of the record. *See State v. Mauritz–Wells Co.*, 141 Tex. 634, 175 S.W.2d 238, 241 (1943) ("It is a settled rule that the express mention or enumeration of one person, thing, consequence, or class is equivalent to an express exclusion of all others.").

## DISCUSSION AND HOLDINGS

### I.

In points of error one and two, Gulf States in effect complains that the district-court judgment, by limiting the scope of the remand to the Commission, permanently denies the utility an agency adjudication regarding what part of the $1.453 billion, if any, constituted a prudent investment that could be included in the utility's rate base. Under these two broad assignments of error, Gulf States marshals four distinct arguments as to why the district court's judgment cannot stand: (1) the disallowance of the $1.453 billion prevents the Commission from fulfilling its statutory duty to balance consumer and utility interests, and to set just and reasonable rates; (2) the district court erroneously refused to remand the cause to the Commission to take additional evidence under APA section 2001.175(c); (3) the disallowance results in confiscation and violates Gulf States' due-process rights; and (4) the Commission's erroneous conclusion of law 10, in which it purported to have authority to reexamine its prudence determination in a subsequent proceeding, "irreparably tainted" the Commission's entire final order. Before we address each of these contentions, we will consider the Commission's argument that

Gulf States has waived certain arguments raised in its first two points of error.

### A. Gulf States' Waiver of Error

Gulf States argues in its first two points of error that the Commission's misinterpretation of its statutory authority prevented it from making a final determination regarding the prudence of the $1.453 billion expenditure. Consequently, the district court erred in failing to remand the issue to the Commission. The Commission contends that Gulf States has waived any complaints regarding the Commission's error in misconstruing its statutory authority because Gulf States failed to complain about the error in a motion for rehearing as required by APA section 2001.-145. We disagree.

The Commission correctly argues that a point not preserved in a motion for rehearing is waived on appeal. *Pedernales Elec. Coop. v. Public Util. Comm'n*, 809 S.W.2d 332, 340 n. 3 (Tex.App.—Austin 1991, no writ); *Sears v. Texas State Bd. of Dental Examiners*, 759 S.W.2d 748, 750 (Tex.App.—Austin 1988, no writ). The purpose behind section 2001.145 is to provide an administrative agency with an opportunity to correct its own errors so that relations between reviewing courts and agencies may be orderly, and so that the agencies may effectively exercise their delegated powers of administration. *See* 2 Frank E. Cooper, *State Administrative Law* 559–602 (1965). Therefore, a party "aggrieved" by a final decision in a contested case must exhaust all administrative remedies before it is entitled to judicial review. APA § 2001.171; *see Lindsay v. Sterling*, 690 S.W.2d 560, 563 (Tex.1985). This principle does not apply, however, to the specific facts of this case because Gulf States was not "aggrieved" by the Commission's original decision to reconsider the prudence of the $1.453 billion expenditure in a subsequent proceeding.

At the time of the Commission's final order, the Commission's decision to reexamine the prudence of the $1.453 billion expenditure at a later proceeding favored Gulf States. Finding that Gulf States had not met its burden of proving the prudence of $1.453 billion, the Commission allowed Gulf

States a second opportunity to make its case. Consequently, Gulf States had no reason to complain of the Commission's action.

 Those parties truly aggrieved by the Commission's action voiced their concerns to the agency in their various motions for rehearing, allowing the Commission the opportunity to correct its error as contemplated by section 2001.145. Their efforts in this docket and the related suit for declaratory judgment culminated in the supreme court's decision in *Coalition of Cities.* Only after this decision, and the district court's failure to remand the issue to the Commission, did Gulf States become "aggrieved" to the degree contemplated by the APA. We conclude that Gulf States was not required to complain of an error essentially made in its favor in order to address the consequences of the reversal of that error on appeal. Therefore, Gulf States has not waived any of the issues presented in its first two points of error.[11]

### B. Balancing Consumer and Utility Interests

 Gulf States argues that because PURA requires the Commission to set rates that are just and reasonable to consumers and to utilities, *see* PURA §§ 2, 38, the Commission exercises the discretion to balance the interests of these groups when setting rates. Gulf States further alleges that, by attempting to reexamine the prudence of the $1.453 billion, the Commission was fulfilling its duty to balance these interests in a ratemaking proceeding. From these premises, Gulf States draws the conclusion that the Commission must be given an opportunity to strike the balance that, but for its error of law, it would have struck in the second ratemaking proceeding. We reject this contention. PURA ensures that the Commission's discretion to balance consumer and utility interests is not unbridled, but rather restricted by specific mandates. *See, e.g.,* PURA § 41 (dictating precisely how Commission must compute certain components of rate

base); *id.* § 41(c)(3) (defining certain categories of expenses wholly excluded from recovery through rates). Moreover, the nature of the process by which rates are set largely determines the extent of the Commission's discretion to balance the interests of utilities and consumers. Ratemaking occurs through the mechanism of an adjudicative hearing. *See* APA § 2001.003(1). In any proceeding involving a change in rates, the utility has the burden to prove the prudence and reasonableness of its expenditures before the Commission may approve the rate increase. PURA § 40; *Coalition of Cities,* 798 S.W.2d at 563; *Public Util. Comm'n v. Houston Lighting & Power Co.,* 778 S.W.2d 195, 198 (Tex.App.—Austin 1989, no writ). The supreme court has succinctly stated one result attending the allocation of that burden: "A party who fails to meet its burden of proof loses. The party who has the burden but fails to persuade the trier of fact is not entitled to a second trial to present more evidence." *Coalition of Cities,* 798 S.W.2d at 563–64. This quotation reveals that the Commission's duty as fact-finder carries no correlative power to strike a balance, as to the setting of rates, unsupported by a utility's persuasive record evidence. *See Jersey Cent. Power & Light Co. v. Federal Energy Regulatory Comm'n,* 810 F.2d 1168, 1180 (D.C.Cir.1987) (holding that balancing must be based on factual findings).

### C. Remand Under APA Section 2001.-175(c)

 Gulf States further complains that the district court improperly denied its request to present additional evidence before the Commission pursuant to APA section 2001.175(c). Such a remand is justified when the additional evidence to be adduced is material and good cause exists for the requesting party's failure to present the evidence in the agency proceeding. APA § 2001.175(c); *Buttes Resources Co. v. Railroad Comm'n,* 732 S.W.2d 675, 680 (Tex.App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.). The district court's decision to grant or deny a re-

11. Our decision regarding the Commission's waiver argument is limited to the particular facts of this case. We continue to acknowledge the requirement that parties must preserve error in a motion for rehearing before the agency in order to bring its complaints to the district court on appeal. APA §§ 2001.145, .171; *Sterling,* 690 S.W.2d at 563.

mand request will be reviewed for an abuse of discretion. *Buttes Resources,* 732 S.W.2d at 680. Gulf States presents two arguments in support of its position that a remand is warranted in this case.

■ First, Gulf States argues that the Commission should be permitted to receive evidence concerning the effects of the supreme court's determination in *Coalition of Cities* that the agency had no power to reexamine its implicit final adjudication of the prudence issue. Gulf States cites *Independence Savings & Loan Association v. Gonzales County Savings & Loan Association* for the proposition that a remand may properly be granted to allow an agency to consider how another adjudicative body's decision affects its own final order. *See* 568 S.W.2d 463, 465 (Tex.Civ.App.—Austin 1978, writ ref'd n.r.e.). In *Independence Savings,* a savings and loan association challenged a state agency's approval of a competitor's branch office application. The challenger sought, and the trial court granted, a remand so that the agency could consider a federal agency's intervening final order approving a federal savings and loan branch application for the same area. The approval of the federal branch directly affected the body of evidence underlying a fact finding upon which the approval of the state application turned—whether the new branch office was necessary to foster competition. *See id.* In this case, by contrast, the *Coalition of Cities* decision did nothing to alter or augment, either directly or indirectly, the historical investment data underlying the Commission's prudence determination, nor did it modify the standard by which the Commission reviews that historical data. Consequently, the supreme court's decision could not have affected the Commission's findings derived from that evidence. We therefore reject Gulf States' position that the issuance of the *Coalition of Cities* decision presents a basis for a remand to the Commission.

■ As a second justification for its requested remand, Gulf States avers that it should be allowed to present additional evidence to prove the prudence of expenditures above $2.273 billion because the Commission in effect imposed a new and different standard of proof after the close of the evidence. According to Gulf States, the Commission required the utility to prove the prudence of expenses to be included in rate base by means of a detailed cost-reconciliation study. Gulf States maintains that because the Commission's evidentiary requirement was completely unprecedented, Gulf States had good cause for failing to present the cost reconciliation study to the Commission in the first instance.

Gulf States relies on an opinion of this Court upholding a remand when the requesting utility did not know in advance and could not reasonably anticipate the time period for which it could recover prudently incurred costs. *See Public Util. Comm'n v. Houston Lighting & Power Co.,* 715 S.W.2d 98, 105 (Tex.App.—Austin 1986), *aff'd in part & rev'd in part on other grounds,* 748 S.W.2d 439 (Tex.1987), *appeal dism'd,* 488 U.S. 805, 109 S.Ct. 36, 102 L.Ed.2d 16 (1988) (*HL & P*). Gulf States tries to bring itself within the holding of *HL & P* by the bare allegation that the Commission in this case had never before required such a rigorous reconciliation of costs in order to determine the prudence of expenditures. Gulf States has provided us no way to test the accuracy of this contention. However, even assuming the verity of Gulf States' allegation, we believe *HL & P* is distinguishable.

Unlike the utility in *HL & P,* Gulf States was fully aware of those costs the prudence of which it would have to justify in order to include them in its rate base. Gulf States failed to present evidence sufficient to persuade the Commission that those costs were prudent, even though it knew in advance that its success would turn on the probative force of its evidence. We think this situation analogous to that presented in *Texas Oil & Gas Corp. v. Railroad Commission,* 575 S.W.2d 348 (Tex.Civ.App.—Austin 1978, no writ). There, the appellant sought a remand to the agency to introduce seismic data that was material to the dispute, but which the court found had been available during the original agency proceedings. The court rejected the appellant's argument that, because it mistakenly believed certain evidence would be unnecessary to contradict its opponent's evi-

dence, it had good cause for failing to present that evidence. The court flatly rejected the contention that errors in judgment made by a party during the agency hearing constitute good cause for ordering the agency to consider additional evidence. *Id.* at 352.

The agency record in the instant case reflects that Gulf States had a full and fair opportunity to present all the historical facts necessary to justify the prudence of its expenditures. That the fact-finder found a substantial portion of Gulf States' evidence unpersuasive does not of itself warrant a remand. The agency is the sole judge of the weight to be accorded the evidence presented before it. *See Southern Union Gas Co. v. Railroad Comm'n*, 692 S.W.2d 137, 141 (Tex. App.—Austin 1985, writ ref'd n.r.e.). The litigant must bear the consequences for failing to marshal the most persuasive case possible. Consequently, we cannot conclude that the district court in this case abused its discretion in refusing to grant a remand under APA section 2001.175(c).

## D. Confiscation and Violation of Due Process

■ Gulf States further maintains that the disallowance of $1.453 billion results in an unconstitutional confiscation and violation of its due-process rights. Gulf States correctly observes that a regulated utility dedicates its property to public service and thus is constitutionally entitled to a fair return on its investment. *Duquesne Light Co. v. Barasch,* 488 U.S. 299, 109 S.Ct. 609, 102 L.Ed.2d 646 (1989); *Federal Power Comm'n v. Hope Natural Gas Co.,* 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944). To pass constitutional muster, the overall result of a rate order must be just and reasonable. *Duquesne,* 488 U.S. at 307–08, 109 S.Ct. at 615–16; *Hope,* 320 U.S. at 602, 64 S.Ct. at 287–88.

■ Relying on these authorities, Gulf States asserts that a disallowance of $1.453 billion is neither just nor reasonable, and, therefore, the rate the Commission set is confiscatory. As we have previously discussed, Gulf States overlooks the procedural context in which rates are set—a contested hearing in which the utility bears the burden of proof. A utility is unquestionably entitled to recover rates that will enable it to operate successfully, to maintain its financial integrity, to attract capital, and to compensate investors for the risk assumed. However, the utility's fiscal security is assured only through proof that it has prudently invested those monies that it seeks to recover from the public. Absent persuasive evidence of the prudence of a utility's expenditures, the Commission may not calculate a rate intended to provide the utility a "fair" return on its property and investment. Rather, the determination of just and reasonable rates is wholly dependent upon findings of fact derived from evidence presented in a contested-case hearing.

The dissent argues that due process guarantees Gulf States a decision on the prudence of the $1.453 billion in costs. We conclude, as the supreme court held in *Coalition of Cities,* that the prudence of these costs has been finally adjudicated. Due process requires no more. At bottom, Gulf States maintains that the paramount importance of providing the utility a fair return on its property and investment overrides all countervailing considerations, including the requirement that the utility bear the burden to show the prudence of the expenditures it would recover through rates. We reject this position. To hold otherwise would be tantamount to allowing the utility to ignore the administrative process the legislature established for the purpose of setting rates.

## E. The "Irreparable Taint"

■ A reviewing court must reverse or remand a contested case for further proceedings "if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are affected by other error of law." APA § 2001.174(2)(D). To prevail on its challenge of the Commission's order, Gulf States must show that its substantial rights have been prejudiced by the agency's error of law. To meet this burden, Gulf States argues that the Commission's attempt to postpone its consideration of the $1.453 billion, based on the erroneous assumption that it could revisit the prudence inquiry, precluded the agency from reaching a correct result

in the original rate proceeding. In so arguing, the utility ignores the fact-finding mission of the administrative agency and how those findings serve the process of judicial review. The supreme court has noted the purposes served by administrative findings of fact:

> One purpose no doubt is to restrain any disposition on the part of the [agency] . . . without a full consideration of the evidence and a serious appraisal of the facts. Another is to inform protestants of the facts found so that they may intelligently prepare and present an appeal to the courts. Still another is to assist the courts in properly exercising their function of reviewing the order.

*Miller v. Railroad Comm'n,* 363 S.W.2d 244, 245–46 (Tex.1962). The agency must articulate findings that support its conclusions of law. The reviewing court tests the agency's conclusions to determine whether they are reasonably supported by the findings and by substantial evidence in view of the reliable and probative evidence in the record as a whole. *Texas Health Facilities Comm'n v. Charter Medical–Dallas, Inc.,* 665 S.W.2d 446, 452 (Tex.1984). Gulf States would have us invert this process by holding that an erroneous conclusion undermines the validity of the agency's fact-finding, irrespective of the record evidence.

▪ Gulf States suggests that the Commission would have altered its findings of facts based on the evidence presented had it known it could not grant the utility a second chance to present more persuasive evidence. However, the Commission is not permitted to determine a just and reasonable rate and then "back into" the required findings of fact. A basic purpose of requiring findings of fact is to ensure that an agency's decision comes *after,* not *before,* a careful consideration of the evidence. Agency conclusions should follow from its serious appraisal of the facts. Gulf States here suggests that if the Commission had known its decision would be final, it would have reshaped its findings of fact to "back into" a decision more favorable to the utility. We reject this cynical view of the administrative process.

▪ In conclusion of law 18, the Commission held that $1.453 billion of River Bend capital costs should not be included in Gulf States' rate base. In conclusion of law 18A, the Commission found that "GSU [Gulf States] has not met its burden of proving that the capital costs of River Bend above a reasonable Definitive Cost Estimate of $2.273 billion were reasonably and prudently incurred." The following underlying findings of fact reflect the Commission's evaluation of the evidence Gulf States presented in support of the prudence of the $1.453 billion increase in plant costs.

121. The Incremental Estimate File (IEF) was primarily a cost tracking and accounting tool and was not designed to provide a detailed justification of cost increases.

122. The fact that GSU had a legitimate process for reviewing and approving changes in project costs does not show that those costs were reasonable.

124. The PLG Report's analysis of the reasons for growth in the cost of River Bend was cursory and inadequate.

125. PLG has cited low cost per kW as an indicator of prudent management and as a key measure of management performance in other proceedings. The absence of a cost-per-kW comparison in this case damaged the credibility of the PLG report.

131. GSU could have developed a far more complete and accurate investigation of the reasons for the growth in River Bend costs.

132. GSU's non-statistical explanations of the reasons for the high capital cost of River Bend were inadequate and unconvincing.

162. The fact that River Bend's costs are within a 90 or 95 percent statistical confidence interval does not explain or justify the high cost of the plant.

163. The statistical analyses presented in this docket were inadequate to prove the reasonableness or prudence of River Bend construction costs.

Gulf States elected not to present any cost-per-kilowatt analyses of River Bend's cost growth.[12] Instead it relied on (1) statistical evidence that the Commission found "inadequate"; (2) non-statistical evidence, the Incremental Estimate File ("IEF"), which the Commission found "inadequate and unconvincing"; and (3) the PLG Report, which was not credible without a cost-per-kilowatt comparison.

Having found that Gulf States could have developed a more complete and accurate explanation for the cost increases at River Bend, the Commission erroneously attempted to afford the utility a second chance to do so in a later proceeding. The Commission's effort exceeded its statutory authority. *Coalition of Cities,* 798 S.W.2d at 564. But this error cannot have tainted the Commission's basic findings that Gulf States' statistical and non-statistical evidence was inadequate and unconvincing unless the facts are appraised *after* an agency reaches its conclusions rather than *before.*

Returning to the basis for this point of error, Gulf States must show that the harm it suffered, the exclusion of $1.453 billion in costs from rate base, was caused by the Commission's erroneous conclusion that it could reexamine the prudence of those expenditures. The Commission's error was affording Gulf States a second chance to present persuasive evidence that its expenditures were prudent and reasonable. However, a second chance to present evidence is not a "substantial right" utilities may claim. *Id.* at 565. There can be no harm done to a substantial right that never existed. Failure to succeed is not a recognized ground for a rehearing. The harm complained of in this appeal, exclusion of $1.453 billion from rate base, resulted from the unpersuasiveness of the evidence Gulf States chose to present to the Commission in the single proceeding to which it was legally entitled.

Although the Commission may have intended to reevaluate the prudence of the $1.453 billion in cost increases at a later date, it also intended to disallow those costs based on the record evidence presented in this proceeding. *See* Conclusion of Law 18. This was the only conclusion it could make based on its findings that Gulf States' evidence was not persuasive. Gulf States argues that the Commission might have granted its motion for rehearing had it known it could not revisit the prudence of the excluded costs in a future proceeding. We reject this basis for a remand because the individual commissioner's thought processes are immaterial to judicial review. We judge the agency order on the basis on which it purports to rest. *Pedernales Elec. Coop., Inc. v. Public Util. Comm'n,* 809 S.W.2d 332, 341–42 (Tex.App.—Austin 1991, no writ). We affirm the district court's ruling that no causal link exists between the Commission's error of law and the harm the utility has suffered by the exclusion of substantial dollars from rate base. *See United States v. Morgan,* 313 U.S. 409, 418–20, 61 S.Ct. 999, 1003–04, 85 L.Ed. 1429 (1941); *Texas State Bd. of Examiners in Optometry v. Carp,* 388 S.W.2d 409, 416 (Tex. 1965).

Having rejected all four arguments that Gulf States asserts under points of error one and two, we overrule those points.

---

12. In fact, before entry of a final order, the Commission provided Gulf States with numerous opportunities to provide evidence to meet its burden of proof. The transcript of the final order meeting contains the following:

Commissioner Campbell: I guess I would be inclined to give a second bite at the apple because of the uniqueness.... [N]o one likes to see a utility pushed into bankruptcy.... Would the Company rather we just go on and not consider the remand?

Gulf States' Attorney: If it can't be settled, it's got to be decided.

\* \* \* \* \* \*

Commissioner Greytok: Now this Commission is sitting here—I hear Commissioner Campbell offering you the opportunity—and I think its been obvious that we're offering all of you the opportunity to do something for ratepayers to make this whole thing fly.... What I'm hearing is that you don't want that consideration.

\* \* \* \* \* \*

Gulf States' Attorney: What I'm saying to you is, I'm not going to tell you anything but straight what we think. What we think is, a remand isn't necessary because we met our burden of proof.

## II.

In its third point of error, Gulf States complains that the Commission's order is arbitrary and capricious and unsupported by substantial evidence. *See* APA § 2001.-174(2)(E), (F); *Charter Medical–Dallas,* 665 S.W.2d at 452–53.

In disposing of this point, we observe initially that Gulf States' efforts to obtain rate recognition of its overall investment in the River Bend project presented for the Commission's determination two distinct inquiries: first, whether Gulf States' decision to resume the project following a construction hiatus was prudent at the time the decision was made in 1979; and second, what portion, if any, of the extensive cost growth beyond the projected completion costs was prudently incurred? To satisfy these inquiries, Gulf States relied upon both statistical and non-statistical evidence. A cost tracking report called the Incremental Estimate File and testimony explaining it constituted Gulf States' principal non-statistical evidence; cost comparisons with other nuclear power plants constructed at the same time as River Bend were the focus of its statistical evidence. Gulf States chose not to present any cost-per-kilowatt data on the plant.

With regard to the first inquiry, the Commission determined that Gulf States' decision to restart and complete construction of the River Bend project was prudent. In reaching this conclusion, the Commission reviewed Gulf States' 1979 definitive cost estimate ("DCE"), the utility's projected total cost for completing River Bend. The Commission concluded, however, that Gulf States' DCE was too low. Based on evidence from the various parties, the Commission decided that Gulf States had failed to consider foreseeable

expenses, like those attending the more rigorous nuclear regulatory climate in the aftermath of Three Mile Island. The Commission also found that Gulf States' fifty-month completion schedule was overly ambitious and that a sixty-month projection would have been more realistic. From these various indicators of expenses foreseeable in 1979, the Commission adjusted the DCE upward to $2.273 billion,[13] and determined that from a 1979 perspective, the decision to go forward with foreseeable construction costs of $2.273 billion was prudent.

With regard to the second inquiry, the determination of what portion of actual construction costs was reasonably and prudently incurred, the Commission began with the adjusted DCE figure of $2.273 billion and found that these projected costs were prudent. Finding of Fact 164. The Commission then examined the evidence presented to determine what portion, if any, of the $1.453 billion actual cost growth above the adjusted DCE had been prudently incurred. The Commission did not find the evidence persuasive to justify including any of the $1.453 billion in rate base. Finding of Fact 164A, Conclusions of Law 18, 18A. In its third point of error, Gulf States raises a number of arguments to show that the Commission's refusal to be persuaded was arbitrary and capricious and unsupported by substantial evidence—in short, that the final order is unreasonable when considered in light of the entire record.

Gulf States' principal contention is that, because no party ever advocated a disallowance as large as that which actually occurred, the Commission had no basis for disallowing the entire $1.453 billion. This

---

13. The examiners and the Commission derived the adjusted DCE as follows:

| | |
|---|---|
| $ 1.729 billion | Gulf States 1979 DCE |
| .183 | Amount added to reflect a 60–month rather than a 50–month schedule. |
| .100 | Amount added to cover cost of certain safety and TMI-related "backfit" requirements foreseeable in 1979. |
| .018 | Amount added for specific engineering cost changes foreseeable in 1979. |
| $ 2.030 billion | |
| .243 | 15% of "to-go" costs as of 1979 added as informal contingency to cover foreseeable changes (e.g., cost escalation/inflation and TMI-related regulation) and known but unquantifiable changes (e.g., stricter piping requirements and ongoing vendor negotiations). |
| $ 2.273 billion | |

argument turns on the assumption that a utility's expenditures are presumed prudent unless shown to be otherwise. Both PURA and case law reflect the fallacy of this position. *See* PURA § 40 (utility bears burden to show prudence of expenditures to be included in rates); *see also Coalition of Cities,* 798 S.W.2d at 563 (utility enjoys no presumption that its expenditures were prudently incurred); *Public Util. Comm'n v. Houston Lighting & Power Co.,* 778 S.W.2d at 198 (to raise rates, utility must bear burden of proving that each dollar of cost incurred was reasonably and prudently invested). These authorities indicate that the failure by parties challenging a rate increase to seek a total disallowance does not, ipso facto, render the unchallenged expenditures prudent. A utility may not rely on such burden-shifting to make its prudence case. "A utility has the burden to prove the prudence and reasonableness of its expenditures before a rate increase can be approved." *Coalition of Cities,* 798 S.W.2d at 563. The Commission determined that Gulf States did not meet its burden of demonstrating that any of the cost growth was prudently incurred and therefore the $1.453 billion in costs above the adjusted DCE should not be included in rate base. *See* Conclusions of Law 18, 18A. If there is any evidence supporting either an affirmative or a negative finding, we must uphold the agency decision. *Charter Medical–Dallas,* 665 S.W.2d at 453.

■■■ To prevail on this point of error, Gulf States must show that reasonable minds could not have reached the conclusion the Commission reached. *Texas State Bd. of Dental Examiners v. Sizemore,* 759 S.W.2d 114, 116 (Tex.1988). In conducting a substantial evidence review of an agency order regarding the prudence of a utility's expenditures, we must uphold the agency decision if substantial evidence in the record would support either affirmative or negative findings. *Charter Medical–Dallas,* 665 S.W.2d at 453. An agency's negative findings will be sustained unless the evidence conclusively requires affirmative findings. *Gerst v. Goldsbury,* 434 S.W.2d 665, 667 (Tex.1968). When the evidence is contradictory, we resolve any conflict in favor of the agency's decision. *Auto Convoy Co. v. Railroad Comm'n,* 507

S.W.2d 718, 722 (Tex.1974). Even when the reviewing court may have struck a different balance, it may not substitute its judgment for that of the agency. *Sizemore,* 759 S.W.2d at 116. The burden is on Gulf States to demonstrate from the evidence that it conclusively established the prudence of the $1.453 billion expended. *Charter Medical–Dallas,* 665 S.W.2d at 453. Here, the findings of fact and the record evidence adequately support the Commission's conclusion that the utility failed to meet its burden of proof.

■■■ In its report, the Examiner explained that it was "up to GSU, not the intervenors, to justify these costs ... [to] explain why River Bend is the fifth most expensive plant, per kW, in the United States." Examiner's Report at 128. After all the evidence had been presented, the Examiner reported, "GSU doesn't know why River Bend cost so much." *Id.* The Examiner and the Commission found the utility's non-statistical evidence, principally the IEF report, "inadequate and unconvincing." Finding of Fact 132. The Examiner found that Gulf States' statistical evidence showing the River Bend costs to be within a 90 or 95 percent confidence range did not explain or justify the high cost of the plant. Proposed Finding of Fact 162. The Examiner and the Commission agreed Gulf States "could have developed a far more complete and accurate investigation of the reasons for the growth in River Bend costs." Finding of Fact 131.

The Examiner *reluctantly* relied on Gulf States' statistical evidence to include a large portion of the increased costs in rate base. Its finding of fact 163 states: "[A]lthough statistical analysis is an imprecise measure, it is the best one offered in this proceeding." The Commission disagreed and found that *Gulf States' best evidence was not good enough.* The Commission's finding of fact 163 states, "The statistical analyses presented in this docket were inadequate to prove the reasonableness or prudence of River Bend construction costs." In weighing the credibility of the evidence, the Commission was performing its proper function. *Gerst v. Guardian Sav. & Loan Ass'n,* 434 S.W.2d 113, 116 (Tex.1968); *Texas State Bd. of Den-*

*tal Examiners v. Silagi,* 766 S.W.2d 280, 283 (Tex.App.—El Paso 1989, writ denied). APA section 2001.174 forbids this Court from usurping the agency's adjudicative authority. *Charter Medical–Dallas,* 665 S.W.2d at 452; *Sizemore,* 759 S.W.2d at 117. Gulf States also complains, in essence, that the Commission failed to consider testimony of certain witnesses and failed to credit evidence that the hearing examiners found persuasive. In response, we observe that an agency may or may not accept witnesses' testimony; the agency, not the reviewing court, is the judge of the weight to be accorded that testimony. *Southern Union Gas Co.,* 692 S.W.2d at 141. Hence, we may not reverse the Commission's determination that Gulf States' evidence was too superficial or otherwise unpersuasive to quantify prudent expenditures associated with cost growth. Taken together, the findings of fact and the record evidence provide a reasonable basis for the Commission's conclusion that Gulf States failed to establish the prudence of River Bend's construction costs in excess of $2.273 billion. We overrule the third point of error.

We note the dissent comes to a different conclusion by limiting the utility's burden to going forward with evidence of prudence while shifting the burden of persuasion to the party seeking to establish that a utility's expenditures are imprudent. *Gulf States Utils. Co. v. Coalition of Cities for Affordable Util. Rates,* 883 S.W.2d 739 (Tex.App.—Austin 1994) (Powers, J., dissenting). Our supreme court has rejected this contention: "A party who fails to meet its burden of proof loses. The party who has the burden but fails to persuade the trier of fact is not entitled to a second trial to present more evidence." *Coalition of Cities,* 798 S.W.2d at 563–64. In an earlier decision in which the dissenting justice joined, this Court likewise rejected the burden shifting now advocated by the dissent:

We understand Gulf States to mean that once it offered evidence that its decision

would benefit its ratepayers, it had satisfied its burden of proof, which then shifted to either the Commission or the intervenors to show the availability of a 'distinctly superior alternative' to the decision taken. We find no basis in either PURA § 40 or the caselaw construing it for such burden shifting.

*Gulf States Utils. Co. v. Public Util. Comm'n,* 841 S.W.2d 459, 476 (Tex.App.—Austin 1992, writ denied). It is too late to argue that in a ratemaking proceeding in Texas the burden of persuasion does not fall squarely on the utility claiming the prudence of its expenditures. The supreme court's ruling in *Coalition of Cities* cannot be ignored by labeling it *dicta. See also Texas–New Mexico Power Co. v. Texas Industr. Energy Consumers,* 806 S.W.2d 230, 233 (Tex.1991); *City of Somerville v. Public Util. Comm'n,* 865 S.W.2d 557, 563 n. 17 (Tex.App.—Austin 1993, no writ); *Cities of Abilene v. Public Util. Comm'n,* 854 S.W.2d 932, 940–41 (Tex.App.—Austin 1993, writ requested) (holding that the utility did not carry its burden of proof by merely "opening its books to inspection").

### III.

■ In its final order, the Commission permitted Gulf States to include in its rate base certain deferred expenses associated with River Bend that the utility had accrued from the time the new facility was placed in operation through December 1987. In its fourth point of error, Gulf States assails the district court's reversal of this decision; the Commission, as appellant, urges the same challenge in its first point of error. The matter of these deferred expenses originally arose in an earlier rate proceeding, PUC Docket No. 6525, filed in late 1985. The parties to that proceeding, the same as those now before us in this appeal, entered into a stipulation settling that case, which the Commission approved by written order in June 1986.[14] All parties agreed that various costs associated with River Bend and a coal pow-

**14.** The stipulation and order entered in Docket No. 6525 provide:
The Commission further reserves the right to consider, and all parties to the rate case described above shall have the right to raise, the reasonableness, prudence and appropriate regulatory treatment of any deferred expenses in the rate case in which rate base treatment for plant is requested.

ered generating plant, Big Cajun 2, Unit 3, would be accrued and deferred until Gulf States' next rate case. The proceeding underlying this appeal was Gulf States' next rate case.

In reversing the Commission's inclusion of deferred expenses in rate base, the district court relied on this Court's original opinion in *City of El Paso v. Public Utility Commission*. In our original opinion in *City of El Paso*, we concluded that PURA section 41(a) forbade inclusion in rate base of any deferred expenses associated with a newly constructed plant accruing *after* the plant's dedication to public use. However, we withdrew that opinion on motion for rehearing. *City of El Paso v. Public Utility Commission*, 839 S.W.2d 895, 901 (Tex.App.—Austin 1992). On rehearing, we substantially modified *City of El Paso* to hold that PURA section 41(a) only precludes inclusion in rate base of post-in-service carrying costs and does not address inclusion of post-in-service operating and maintenance ("O & M") costs. *Id.* at 915–16. "Accordingly, whatever other objections may be made to the inclusion in rate base of post-in-service O & M costs, such inclusion is not inconsistent with PURA section 41(a)." *Id.* at 916.

The supreme court has now declared that section 41(a) does not prohibit the inclusion in rate base of capitalized expenditures made after the commercial operation date; carrying costs and O & M costs may be included. *State of Texas v. Public Util. Comm'n*, 883 S.W.2d 190, 200 (1994). Based on that holding, the supreme court reversed our decision to disallow the inclusion in rate base of post-in-service carrying costs. *City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179, 189 (1994). Therefore, the Commission did not exceed its statutory authority in this proceeding by including in rate base both post-in-service carrying costs and O & M costs. We sustain the Commission's first point of error and Gulf States' fourth point of error.

## IV.

■ The Commission's final order reduces Gulf States' deferred expenses by $1.50 for every $1.00 in interim rates collected. The Commission and Office of Public Utility Counsel each bring points of error challenging the district court's decision that the Commission did not have the authority to grant an interim rate increase subject to the $1.50 for $1.00 offset. The district court found that the Commission erred in "deducting from GSU's rate base $1.50 for each $1.00 of interim revenues collected" and ordered that the Commission not "reduce rate base by $1.50 for each $1.00 of interim rate revenues collected." The Commission and Office of Public Utility Counsel argue that the Commission had the authority to grant Gulf States an interim rate increase subject to the $1.50 for $1.00 offset ordered. We agree.

PURA section 43(d) vests in the Commission discretion to fix temporary or interim rates. Commission rules further provide:

> Interim rates may be conditional upon an obligation to refund all or a part thereof upon a final order or such other condition as the commission or the examiner may deem appropriate.

16 Tex.Admin.Code § 21.84(c) (1986). Under section 21.84, the Commission may grant a refund and may impose other conditions it deems appropriate. The interim offset provision serves both functions: it refunds to the ratepayers $1.00 for $1.00 the amount provided to the utility in interim rates, and it mandates an additional credit of fifty cents to compensate ratepayers for the risks associated with interim rate relief under the particular circumstances of this case. We are not persuaded by Gulf States' argument that the offset violates section 21.84 by refunding more than "all or part" of the interim rates; it refunds all, and adds the condition that the utility compensate the ratepayers for the use of their money and their assumption of risk. We hold that the offset comports with both PURA and Commission rules governing interim rates.

■ Gulf States argues that the district court judgment should be affirmed because the Commission's interim rate order was not supported by substantial evidence. We do not agree. During the hearing on interim rates, the Commission was presented with

evidence of Gulf States' precarious financial condition. Dr. Samuel Hadaway, a witness for North Star Steel, proposed the $1.50 offset, noting that the approval of interim rates would not guarantee Gulf States' financial viability. Of particular concern was the possibility that even if the Commission imposed interim rates on Texas ratepayers, the Louisiana regulatory agency might refuse to impose interim rates on Louisiana ratepayers. Texas ratepayers would then carry more than their fair share of the financial burden and involuntarily assume the risk that interim relief from Texas ratepayers alone might not protect Gulf States from bankruptcy. To minimize this risk, Hadaway suggested the $1.50 offset to compensate Texas ratepayers for the risk that emergency relief would be wasted, and to provide a return to the ratepayers for the use of their funds. Hadaway noted that a similar offset mechanism had been used by the Arizona Public Service Commission to compensate ratepayers for rates dedicated to construction work in progress. Arizona Public Service Company was ordered to reduce its recovery of deferred costs by $1.20 for every $1.00 of cash return paid on CWIP. *Re Arizona Pub. Serv. Co.*, 64 P.U.R.4th 147, 150 (Ariz.1984). In this case, the additional fifty cents was proposed as a credit for ratepayers against Gulf States' deferred expenses. We believe Hadaway's testimony provided an adequate basis for the Commission's decision to implement the $1.50 offset; the offset was a reasonable condition and its imposition was supported by substantial evidence. We sustain the Commission's second point of error and Public Utility Counsel's first point of error.

## V.

■ In its fifth point of error, Gulf States complains that the district court erred in affirming the Commission's treatment of the utility's federal income tax expenses. Applying the "actual taxes paid" doctrine announced in *Public Utility Commission v. Houston Lighting & Power Co.*, 748 S.W.2d 439 (Tex.1987), *appeal dism'd*, 488 U.S. 805, 109 S.Ct. 36, 102 L.Ed.2d 16 (1988), and *Public Utility Commission v. GTE–SW*, 833 S.W.2d 153 (Tex.App.—Austin 1992, writ granted), the Commission refused to award Gulf States' shareholders any tax savings associated with the $1.453 billion and therefore reduced the examiners' recommended tax calculation by approximately $30 million.

Gulf States urges this Court to reconsider our position on the actual-taxes-paid doctrine reflected by our decision in *GTE–SW*. We continue to read *HL & P* to require that tax savings flowing from deductions for disallowed expenses be passed on to rate payers. *See GTE–SW*, 833 S.W.2d at 168–69. Any changes in this actual-taxes-paid doctrine must be effected by the supreme court. We overrule Gulf States' fifth point of error.

## VI.

Finally, Gulf States' sixth point of error complains of the restrictive remand resulting from the specific instructions the district court gave in its final judgment. Because we have concluded that the district court improperly remanded this cause to the Commission, the complaint regarding the restrictive remand is moot. We therefore do not address Gulf States' sixth point of error.

## CONCLUSION

We hold that the district court correctly concluded that Gulf States failed to meet its burden of proving the prudence of $1.453 billion in expenditures, resulting in the Commission's refusal to include those expenditures in rate base. We also affirm the district court's holding that there is no causal link between the harm Gulf States suffered due to the exclusion of those expenditures from rate base and the Commission's erroneous attempt to afford the utility another opportunity to present more persuasive evidence regarding the prudence of the expenditures. We reverse the district court's judgment including the remand of the matter to the Commission for reconsideration of deferred expenses. Additionally, having concluded that the Commission acted within its statutory authority, we also reverse the district-court judgment disapproving of the offset of $1.50 from deferred expenses for every $1.00 of interim revenue. The effect of our opinion is to approve the entire Commission

order exclusive of the Commission's decision to reexamine the prudence of the $1.453 billion, a decision the supreme court in *Coalition of Cities* has already decided was an error of law. We render judgment that the Commission order is affirmed.

POWERS, Justice, dissenting.

I withdraw my dissenting and concurring opinion dated May 25, 1994, and substitute the following in its place. Believing Gulf States has been deprived of property without due process of law, I respectfully dissent.

### THE RIGHT TO AN AGENCY ADJUDICATION

Under the Fourteenth Amendment to the Constitution of the United States, Gulf States possesses a property interest in an agency decision in the contested case now before us—a written decision arrived at according to the terms of the Public Utility Regulatory Act (PURA)[1] and the Texas Administrative Procedure Act (APA).[2] *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428–33, 102 S.Ct. 1148, 1153–56, 71 L.Ed.2d 265 (1982). Under the Fourteenth Amendment, the State may not fix Gulf States' rates without a decision on the prudence issue by the only state organ—the Public Utility Commission—having the power to make such a decision. *See Logan*, 455 U.S. at 434–35, 102 S.Ct. at 1156–58; *see also West Ohio Gas Co. v. Public Utils. Comm'n*, 294 U.S. 63, 55 S.Ct. 316, 79 L.Ed. 761 (1935).

It is indisputable that only the Commission may adjudicate the prudence of the $1.453 billion of River Bend construction costs. No court may do so. It is also indisputable that the Commission never intended that its final order should adjudicate the prudence issue regarding the $1.453 billion. According to the supreme court, the Commission's final order, in its Conclusion of Law Number 10, attempted "a *deferral* rather than a determination of the [prudence] issue." *Coalition of Cities for Affordable Util. Rates v. Public*

Util. Comm'n, 798 S.W.2d 560 (Tex.1990), cert. denied, 499 U.S. 983, 111 S.Ct. 1641, 113 L.Ed.2d 736 (1991).

The majority in this appeal hold, however, that the Commission *constructively* adjudicated, whether it intended to or not, the prudence of the $1.453 billion of River Bend construction costs. Not only was the Commission's attempted deferral of the issue invalid, the majority hold, the same agency order *adjudicated* the very issue deferred for future adjudication. The majority reach this conclusion based on the following passage of the opinion in *Coalition of Cities:*

> In this rate case, the PUC declared that GSU failed to meet its burden of proof to show that the entire $4.5 billion expense was prudently incurred.... A party who fails to meet its burden of proof loses. The party who has the burden but fails to persuade the trier of fact is not entitled to a second trial to present more evidence. By stating that GSU failed to meet its burden of proof on the prudence of the $1.453 billion, the PUC *effectively disallowed* that amount from the rate base.

*Coalition of Cities*, 798 S.W.2d at 563–64 (emphasis added). I believe the majority reach their conclusion because they think the quoted passage is binding by way of res judicata, but it is immaterial whether they believe that or whether they believe it is binding by way of stare decisis or by way of persuasive dictum. I believe the passage is obiter dictum that we are free to disregard save to the extent we find it persuasive;[3] I do not find it persuasive at all, for reasons I shall point out below. I shall first explain, however, why the statement is dictum only.

### THE DICTUM IN *COALITION OF CITIES*

It is undisputed that the decision in *Coalition of Cities* adjudicated a *collateral attack* upon the Commission order now before us on direct attack pursuant to PURA section 69—while the present suit was pending in district court, certain of the appellees sued in district

1. Tex.Rev.Civ.Stat.Ann. art. 1446c, § 69 (West 1994).

2. Tex.Gov't Code Ann. § 2001.174 (West 1994).

3. Dictum is not binding on another court because it does not represent an adjudication. *Grigsby v. Reib*, 105 Tex. 597, 153 S.W. 1124, 1126 (1913).

court for an injunction restraining the Commission from attempting to adjudicate the prudence of the $1.453 billion of River Bend construction costs that the agency had previously deferred for future adjudication. The district court issued the injunction; the supreme court affirmed that action in *Coalition of Cities.* What was *necessary* for the supreme court to decide in that appeal? [4]

A collateral attack upon an agency order may be maintained successfully on one ground alone—that the order is void. An agency order may be void in the requisite sense on either of two grounds: (1) the order shows on its face that the agency exceeded its jurisdiction, or (2) a complainant shows that the order was procured by extrinsic fraud.[5] Since *Coalition of Cities* was indisputably a collateral attack upon the Commission's order, the sole issue the supreme court was required to decide—the only issue before the court at all and the only issue that court could decide without overruling numerous of its previous decisions—was *whether the Commission's final order was void* because the agency exceeded its jurisdiction in some respect. (It has never been contended that the order was procured by extrinsic fraud.) *Any statements in the supreme court opinion not required to decide that issue are dicta.*[6]

And, indeed, the supreme court decided that the Commission exceeded its jurisdiction because the face of the agency's order showed that the Commission had divided the River Bend construction costs, adjudicated the prudence of $2.273 billion of such costs, and postponed to another proceeding an adjudication as to the remaining $1.453 billion: "[L]imited by statute and lacking any inherent power, the PUC was powerless to defer its decision to a future proceeding" because

no statute conferred such power expressly or by necessary implication. *Coalition of Cities,* 798 S.W.2d at 564. Consequently, the Commission order was void to the extent the agency had exceeded its jurisdiction by such actions.

## JUDICIAL DICTUM

Even though dictum, the court's statement in *Coalition of Cities,* to the effect that the Commission *had constructively* decided the prudence of the $1.453 billion expenditure, requires our adherence if it appears to be "judicial dictum"—a statement by the supreme court made very deliberately after mature consideration and for future guidance in the conduct of the litigation. *See Parker v. Bailey,* 15 S.W.2d 1033, 1035 (Tex.Comm'n App.1929, holding approved). We cannot say that is the case here. The supreme court expressly declared that "[a]ll issues relating to the merits of the administrative order, including the prudence of all elements of construction costs, remain to be addressed by the trial court," while noting that the court's decision did *not* disallow permanently the $1.453 billion of River Bend construction costs. *Coalition of Cities,* 798 S.W.2d at 565 n. 7.

## WHETHER THE DICTUM IS PERSUASIVE

The text of the supreme court's opinion, as a whole, does not permit in my view the meaning and effect which the majority assign to the court's dictum. I will assume, however, that the dictum has that meaning and effect. Even though dictum, the supreme court's statement is entitled to our adherence to the extent we find it persuasive. I do not

---

**4.** "Dictum" is a statement by a court concerning a matter the court is not required to decide. *Grigsby,* 153 S.W. at 1126. In *Coalition of Cities,* the supreme court was required to decide only whether the Commission order was void. Which party bore the burden of proof on the issue of prudence and the consequence of failing to carry that burden, seem to me utterly unrelated to the question of the agency's jurisdiction. Indeed, those issues necessarily assume the agency *has* jurisdiction to do what it did.

**5.** These are venerable rules. *See, e.g., Alamo Express, Inc. v. Union City Transfer,* 158 Tex. 234,

309 S.W.2d 815 (1958); *Thompson v. Railroad Comm'n,* 150 Tex. 307, 240 S.W.2d 759 (1951); *Railroad Comm'n v. Marathon Oil Co.,* 89 S.W.2d 517 (Tex.Civ.App.—Austin 1935, writ ref'd); *Alpha Petroleum Co. v. Terrell,* 122 Tex. 257, 59 S.W.2d 364 (1933); *Texas Steel Co. v. Fort Worth & D.C. Ry.,* 120 Tex. 597, 40 S.W.2d 78 (1931); *First Federal Sav. & Loan Ass'n v. Vandygriff,* 576 S.W.2d 904 (Tex.Civ.App.—Austin), *rev'd on other grounds,* 586 S.W.2d 841 (Tex.1979).

**6.** *See* note 4, *supra.*

find the dictum persuasive because it requires that one believe the court overruled by implication certain well-established rules of law.

## I.

The dictum declares "the PUC effectively disallowed" the $1.453 billion of construction costs because Conclusion of Law 18A, found in the agency's final order, stated "that GSU failed to meet its burden of proof to show that the entire $4.5 billion expense was prudently incurred." In this single conclusion of law, the majority say, the supreme court determined that the agency had adjudicated the prudence of the $1.453 billion. But the agency order also contained *other* conclusions of law which demonstrate without any possible doubt that the Commission did *not* in fact adjudicate the prudence of that sum. As the supreme court itself declared, the Commission's order, in Conclusion of Law 10, attempted "a *deferral* rather than a determination of the [prudence] issue" regarding the $1.453 billion. *Coalition of Cities*, 798 S.W.2d at 563 (emphasis added).

A reviewing court must adhere to the agency's intention and interpret an agency order according to the principles of statutory construction to discover that intention. *Texas Liquor Control Bd. v. Attic Club, Inc.*, 457 S.W.2d 41, 45 (Tex.1970), *appeal dismissed*, 400 U.S. 986, 91 S.Ct. 459, 27 L.Ed.2d 435 (1971); *Trapp v. Shell Oil Co.*, 145 Tex. 323, 198 S.W.2d 424, 439 (1946). This means that the court must seek the agency's intention from *a general view* of the *whole order*, and the meaning inferred from the order must be one that is suggested by the language of the order itself and one that the text will fairly sanction and clearly sustain. *See Citizens Bank v. First State Bank, Hearne*, 580 S.W.2d 344, 348 (Tex.1979). The language of the Commission's order *as a whole*, when fairly read, will not sustain a conclusion that the agency has adjudicated the prudence of the $1.453 billion; that is a tortured inference. The supreme court itself conceded that the order expressly *deferred* making that very adjudication. How is it logically possible that the agency simultaneously adjudicated an issue and deferred an adjudication

of that very issue? The majority do not explain.

One cannot in law or in fairness seize upon the single Conclusion of Law 18A, rather than the order as a whole and the other conclusions of law, to hold that Conclusion of Law 18A in isolation demonstrates an agency intention to adjudicate the prudence of the $1.453 billion expenditure.

## II.

The only sure inference from the supreme court's opinion in *Coalition of Cities* is that it held, necessarily, that the Commission lacked jurisdiction to divide the River Bend construction costs into two parts which the agency would adjudicate separately regarding prudence; consequently, at least that part of the agency order was *void*. The collateral attack could have been sustained on no other basis. "Void" means that the agency order has no force or effect, binds no one, affects no person's rights, confers no right or protection; it is, in short, an absolute nullity. *See* 49 C.J.S. *Judgments* § 449, at 879 (1947). The supreme court did not explain how a *void* act by the agency can constitute an adjudication of any issue.

## III.

By assigning to the Commission's Conclusion of Law 18A a legal effect that the agency manifestly did not intend, as indicated by the face of the agency's order as a whole, the supreme court in effect fixed the rate base. This is an invasion of the administrative sphere—a usurpation of the legislature's prerogative acting through its agent the Commission. A court is forbidden to make such determinations. *See* Tex. Const. art. II, § 1; *Gerst v. Nixon*, 411 S.W.2d 350, 353–54 (Tex. 1966); *Davis v. City of Lubbock*, 160 Tex. 38, 326 S.W.2d 699, 714 (1959); *Marrs v. Railroad Comm'n*, 142 Tex. 293, 177 S.W.2d 941, 950 (1944).

## IV.

The supreme court's theory, adopted by the majority, is that Gulf States bore the *burden of persuasion* regarding the prudence of the $1.453 billion expenditure, a burden not carried merely by introducing the

company's books in evidence to show that such amount was expended on River Bend for specified items. *Coalition of Cities,* 798 S.W.2d at 563. That theory is not correct unless the supreme court intended to change the law without saying so.

The Commission is bound by statute to calculate a utility's rate base or "invested capital" on the basis of the "original cost of property ... *as recorded on the books of the utility.*" PURA § 39(a) (emphasis added). These books must be kept in a manner prescribed by statute and regulation. *See* PURA §§ 27–34; 16 Tex.Admin.Code §§ 23.-11–.17 (1994). While PURA § 40 places upon a utility the "burden of proof to show that [a] proposed [rate] change ... is just and reasonable," the ordinary interpretation of this statutory language is that it refers only to the *burden of going forward with the evidence.* The burden of persuasion falls upon the party claiming the utility's expenditures, as reflected in its books introduced in evidence, were imprudent in one or more particulars. This interpretation accompanied the very origin of the prudent-investment requirement. *See Southwestern Bell Tel. Co. v. Public Serv. Comm'n,* 262 U.S. 276, 289 n. 1, 43 S.Ct. 544, 547 n. 1, 67 L.Ed. 981 (1923) (Brandeis, J., concurring). It remains the correct interpretation. *See Environmental Defense Fund, Inc. v. Environmental Protection Agency,* 548 F.2d 998 (D.C.Cir.1976), *cert. denied,* 431 U.S. 925, 97 S.Ct. 2199, 53 L.Ed.2d 239 (1977); 2 Kenneth C. Davis & Richard J. Pierce, Jr., *Administrative Law Treatise* § 10.7 at 165–66 (1994); Ron Moss, *Ratemaking in the Public Utility Commission of Texas,* 44 Baylor L.Rev. 825, 852–54 (1992); 1 A.J.G. Priest, *Principles of Public Utility Regulation* 412 (1969).

Under the contrary theory stated as dictum in *Coalition of Cities,* the utility's books carry "no *presumption* that the expenditures reflected therein have been prudently incurred." *Coalition of Cities,* 798 S.W.2d at 563. This then requires that the utility persuade the agency as to the prudence of *each and every expenditure* shown on the utility's books, even those not challenged as being imprudent. This is an unreasonable manner of proceeding; I cannot believe the legisla-

ture intended to place upon the Commission such a time-consuming and expensive burden. And, in truth, the Commission apparently follows the general rule and disregards the "overbroad dictum" of *Coalition of Cities. Moss, supra,* at 853.

The majority and the supreme court are able to say on one ground only that the Commission adjudicated the prudence of the $1.453 billion—since Gulf States failed to prove the prudence of that amount, it "loses." But this cannot be the case, of course, if that burden lay instead upon those who claimed the expenditures were imprudent. I believe that is plainly where the burden lay under the authorities cited above. That I personally failed to detect a contrary statement in another judge's opinion by this Court, in another appeal, is hardly grounds for perpetuating the error.

## CONCLUSION

Because the prudence of the $1.453 billion has never been adjudicated and can *never* be adjudicated by the Commission, under the majority's theory, I would hold Gulf States has been deprived of property without due process of law.